**Rodney D. CLAYTON, Plaintiff,**

v.

**NABISCO BRANDS, INC., Defendant.**

**Civ. A. No. 88–3063.**

United States District Court,
S.D. Texas,
Houston Division.

Aug. 10, 1992.

---

Bruce A. Coane, Scott Breitenwischer, Joyce A. Keating, Coane & Associates, Billie Pirner Garde, Harold Dutton Hardy, Milutin & Johns, Houston, Tex., for plaintiff.

A. Martin Wickliff, Jr., Wickliff & Hall, Houston, Tex., for defendant.

## MEMORANDUM AND ORDER

WERLEIN, District Judge.

Pending is Defendant's Motion for Partial Summary Judgment (Document No. 34), which the Honorable John D. Rainey, United States District Judge, referred to Magistrate Judge Frances H. Stacy for a Memorandum and Recommendation. On June 12, 1992, Judge Stacy submitted and filed her Memorandum and Recommendation. (Document No. 115), and both Plaintiff and Defendant have filed objections to those portions of the Memorandum and Recommendation which are adverse to them respectively.

The Court, having considered Defendant's Motion for Partial Summary Judgment, and the summary judgment evidence, submissions, arguments and authorities of the respective parties in support of and in opposition to such motion, and having further considered the Memorandum and Recommendation of the Magistrate Judge and the objections of the respective parties filed in response thereto, is of the opinion the Defendant's Motion for Partial Summary Judgment should be GRANTED.

The Memorandum and Recommendation of the Magistrate Judge dated June 12, 1992, correctly describes the nature of the case, and the appropriate standard of review on summary judgment. As further supplemented by this Memorandum and Order, Sections I, II, III, and V of the Memorandum and Recommendation of the Magistrate Judge, are approved and adopted as the opinion of the Court. Section IV of such Memorandum, entitled "Intentional Infliction of Emotional Distress," at pages 9 through 12, is not approved or adopted.

### I. *Section 1981*

■ In *Johnson v. Uncle Ben's, Inc.*, 965 F.2d 1363 (5th Cir.1992), the Fifth Circuit declared that Section 101 [1] of the Civil Rights Act of 1991 does not apply retroac-

---

**1.** Section 101(2)(b) of the Civil Rights Act of 1991 amends Section 1981 to include

the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981(b). Thus, under Section 1981 as amended by the Act, racial harassment and other discrimination in an employment relation

occurring after contract formation is actionable. If this amendment applies retroactively, then Clayton may be entitled to pursue a claim under Section 1981; otherwise, because his allegations do not involve formation or enforcement of the employment relationship, his Section 1981 claim must be dismissed. *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).

tively.[2]

· The Court specifically held that with respect to conduct occurring before adoption of the 1991 amendment, Section 1981 applies only to the making or enforcing of a new contract. *Id.; Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). Accordingly, Clayton cannot maintain a Section 1981 claim based on his summary judgment evidence.

## II. *Intentional Infliction of Emotional Distress*

■ Plaintiff alleges that Defendant employed him in July, 1985, and that he was still employed when he filed his amended complaint in June, 1989. In a recent controverting affidavit filed in opposition to Defendant's Motion for Summary Judgment, Clayton states that his employment was terminated in July, 1990. In addition to Title VII claims of discriminatory treatment, Clayton asserts an action for intentional infliction of emotional distress as a pendent claim under state law.

Pursuant to an order contained in the Memorandum and Recommendation of the Magistrate Judge, Clayton filed supplemental affidavits of Clayton himself and of his witness, Dr. Julian Silverblatt, on June 23, 1992. Because these controverting affidavits represent Plaintiff's effort to demonstrate a material issue of fact on intentional infliction of emotional injury, they will be summarized in some detail. Clayton states that he worked for Defendant, evidently in a bakery plant, from July, 1985, until July, 1990, when he was terminated within three weeks of being vested with the company. Over this period of five years, and without specifying any dates or particular periods of time, Clayton states:

● that his shift manager Trask called him a "damn liar," in the presence of one of his supervisors, Sanchez;

● that Trask and Sanchez would yell at him and discipline him for things they thought were wrong with the line, which Clayton states were in reality not wrong;

● that one time Sanchez yelled at Clayton and his crew for not trying to do everything they could with some bad dough, even though they had done everything possible;

● that on numerous occasions Clayton would be disciplined for things "done to the line" on the previous shift, such as on one occasion being written up for the line being dirty, although Clayton had just come on his shift;

● that Clayton was yelled at in the presence of other persons for doing things he did not do;

● that one day Sanchez yelled at Clayton about "not replacing the cups on the line" when Clayton and another employee had replaced them earlier;

● that Sanchez yelled at Plaintiff for being off work when his daughter was ill, claiming he had not called in when in fact he had called Gager[3] to report that he was not coming in to work;

● that Sanchez yelled at Clayton in front of Castro for not speaking to her about cleaning the spray machine, when in fact he had already spoken to her about it;

● that when Clayton got a hernia while lifting cartons in February, 1989, and was taken to the hospital, the safety person Randolph "tried to get Betty [Davis] to say I was hurt before I came to work," and was trying to prove Clayton was attempting to get his employer to pay for a non-work-related accident;

● that Sanchez tried to get one of Clayton's crew to say that she had trouble trying to locate Clayton when the line went down, which was not true;

● that one day Trask, while crawling on his hands and knees under Clayton's line to try to find something wrong with Clayton's line, yelled at Clayton;

● that Rocz tried to get West to say Clayton wasn't around when his line was

---

**2.** *See also Landgraf v. USI Film Products, et al.,* 968 F.2d 427 (5th Cir.1992).

**3.** Clayton's affidavit refers to several persons by name but often fails to identify their positions. Presumably all are other employees of Defendant.

being worked on when in fact Clayton was there;

● that Clayton was constantly watched on his breaks, and when he came to work and when he left, by supervisors who were waiting for him to make a mistake or come in late; and

● that three or four different employees told Clayton on a few occasions that they believed Sanchez or Trask or others were looking for a reason to fire Clayton, or for reasons to write him up.

Clayton's other controverting affidavit is from Dr. Julian Silverblatt, M.D. Dr. Silverblatt states that he saw Clayton for sharp headaches, on April 2, 1987, two weeks after Clayton was hit in the face with some flour at work, and the headaches were treated with Fiorinal capsules during ensuing months; that he saw Plaintiff again on August 8, 1988, for something else, but that Clayton complained that he still had headaches; and that he saw Clayton on February 8, 1989, when Clayton complained that his headaches were bad, sharp, and frontal, that they usually occurred when Clayton was upset or had something on his mind, that they had occurred about twice a week, and that he took Fiorinal pills for two to four days. Dr. Silverblatt states that his "examination was negative" and Clayton was placed on Amitriptyline in an effort to cut down the number of headaches and that this continued at least through November 9, 1989. Dr. Silverblatt's affidavit is dated June 18, 1992.

The foregoing sums up Clayton's basis for alleging that Defendant intentionally inflicted upon him emotional distress of a nature that is actionable under Texas common law.

■ To prevail on a claim for intentional infliction of emotional distress, Texas law requires that the following four elements be satisfied: (1) the defendant acted intentionally or recklessly, (2) the conduct was "extreme and outrageous," (3) the actions of the defendant caused the plaintiff emotional distress, and (4) the emotional distress suffered by the plaintiff was severe. *Tidelands Auto Club v. Walters,* 699 S.W.2d 939, 942 (Tex.App.—Beaumont 1985, writ ref'd n.r.e.).

*Tidelands Auto. Club* departed from earlier decisions by the Texas Supreme Court which had expressly declined to adopt a cause of action for intentional infliction of emotional distress. *See e.g. Fisher v. Carrousel Motor Hotel, Inc.,* 424 S.W.2d 627, 630 (Tex.1967); *Harned v. E-Z Fin. Co.,* 151 Tex. 641, 254 S.W.2d 81, 85–86 (Tex.1953). Nonetheless, both state and federal courts have followed the precedent of *Tidelands Auto. Club* in recognizing such a cause of action in Texas. The Beaumont Court of Appeals relied upon the RESTATEMENT (SECOND) OF TORTS § 46 (1965), which sets forth the four elements for the tort listed above.

The RESTATEMENT provides some guidance as to what kind of conduct satisfies the "extreme and outrageous" element:

It has not been enough that the Defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the Plaintiff to punitive damages for another tort. *Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.* Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

RESTATEMENT (SECOND) OF TORTS § 46, Cmt. d (1965) (emphasis added).

The Fifth Circuit has interpreted Texas law on this subject at least five times since the *Tidelands Auto. Club* case was decided. In *Dean v. Ford Motor Credit Co.,* 885 F.2d 300 (5th Cir.1989), there was evidence of two incidents of missing checks which plaintiff had the responsibility to process. The first missing check showed

up ten days later in the top of her own cash box, under circumstances that indicated plaintiff's supervisor might have surreptitiously been responsible. A day later, plaintiff went to to the bank and opened her purse to discover in her purse two checks made out to and endorsed by her employer. The evidence suggested that plaintiff's supervisor had intentionally placed the two checks in the plaintiff's purse in order to make it appear that she was a thief, or to put her in fear of such an accusation. The Fifth Circuit found that there was sufficient evidence to support a jury finding that the "check incidents" occurred and that defendant was involved in those incidents. The court held that "[m]erely causing the innocent plaintiff to be subject to such an accusation of crime and putting her in fear that it might come passes the bounds of conduct that will be tolerated by a civilized society and is, therefore, outrageous conduct." 885 F.2d at 307. The court cited with approval the RESTATEMENT (SECOND) comment that conduct "is 'outrageous' if it surpasses 'all possible bounds of decency' such that it is 'utterly intolerable in a civilized community'" *Id.* at 306.

In *Wilson v. Monarch Paper Co.*, 939 F.2d 1138 (5th Cir.1991), the court again upheld a jury verdict for intentional infliction of emotional distress under Texas state law. In *Wilson* the defendant had stripped an executive manager of his duties and demoted him in a degrading and humiliating way to the role of an entry level warehouse supervisor with menial and demeaning duties. The long-time executive was transferred to a warehouse, given housekeeping chores with no employees to supervise or assist him, and required frequently to sweep the warehouse. He was also required to clean up after employees in the warehouse cafeteria following their lunch hour. He spent 75% of his time performing these menial, janitorial duties, and was thereby subjected to a painful and embarrassing "total humiliation." Although he had had no history of emotional illness, the plaintiff in time was involuntarily hospitalized with a psychotic, manic episode, suffered a manic depressive illness or bi-polar disorder, and suffered unremitting depression for over two years during which he was given electroconvulsive therapy (shock treatments). It was some four years later that his illness began remission, and allowed him to resume a semblance of a normal life. The evidence indicated that the defendant, unwilling to fire the plaintiff outright, intentionally and systematically set out to humiliate him in the hopes that he would quit.

A reasonable jury could have found that this employer conduct was intentional and mean spirited, so severe that it resulted in institutional confinement and treatment for someone with no history of mental problems. Finally, the evidence supports the conclusion that this conduct was, indeed, so outrageous that civilized society should not tolerate it.

*Wilson v. Monarch Paper Co.*, 939 F.2d at 1145.

In contrast to these cases involving extreme and outrageous behavior, the Fifth Circuit has affirmed dismissals of claims for intentional infliction of emotional distress in cases in which (1) the employer had decided to demote the employee from a position of vice president to senior buyer with a 40% reduction in salary, *Guthrie v. Tifco Industries*, 941 F.2d 374 (5th Cir. 1991); and (2) the employee's manager was extremely hostile to him, constantly criticized him, threatened him with termination on numerous occasions, placed the employee on probation for an indefinite period, realigned his sales territory four or five times in little over a year, assigned him to less productive and less lucrative areas, removed a $30,000 sale from his credits, and the employee then had a series of other managers who treated him in a similar manner, threatened him with termination, wrongfully accused him of leaving pharmaceutical samples without obtaining a doctor's signature, accused him of being disloyal to the company and, after the employee began to suffer psychiatric problems and was placed on disability leave for such, the employer called him in and fired him. *Johnson v. Merrell Dow Pharmaceuticals, Inc. & Dow Chemical Co.*, 965 F.2d 31 (5th

Cir.1992). These kinds of disputes, criticisms, and even abuses, were found by the court in the case last cited to be insufficient to support a claim of intentional infliction of emotional distress. The court wrote:

> In order to properly manage its business, an employer must be able to supervise, review, criticize, demote, transfer and discipline employees. Not all of these processes are pleasant for the employee. Neither is termination.... An employer will not be held liable for exercising its legal right to terminate an employee 'even though he is well aware that such [action] is certain to cause emotional distress.' *Id.* at 34.

In *Ramirez v. Allright Parking El Paso, Inc.*, 970 F.2d 1372 (5th Cir.1992), the Fifth Circuit set aside a jury finding of intentional infliction of emotional distress under Texas law. The plaintiff Ramirez had been employed for approximately 28 years, had received several promotions, had become a general manager of Allright's El Paso operations in 1986, and had reported directly to the president of Allright's El Paso operations. Two years later, a new president of the El Paso operations was selected, who was only 27 years old. Ramirez was fired not long afterwards without warnings or reprimands in his personnel file, and only two months after receiving a pay raise. Subsequent negotiations led to Ramirez being rehired in a supervisory capacity at his previous salary. After reinstatement, however, Ramirez lost his seniority, the salary was less than agreed, and Ramirez was soon demoted to duty as a parking lot attendant, where he was required to work longer hours than the other attendants and to work more weekends than the other supervisors. About nine months after his reinstatement, Ramirez was switched to an hourly wage and required to punch a time clock, which he refused to do, resulting in his being fired.

The Fifth Circuit held that while Allright's conduct was perhaps illegal and discriminatory, the actions were "insufficient to support a finding of extreme and outrageous conduct." Unlike the facts in *Wilson*, the duties that Allright required Ramirez to perform were not menial or demeaning, but were duties that Allright required all of its other supervisors to do on occasion and were duties that Allright had often required Ramirez himself to do before his demotion. Thus, Ramirez was unable to show conduct by his employer of the outrageous and reprehensible nature that was shown in *Wilson*.

> In the present case, Allright is not guilty of that type of reprehensible conduct, which the court classified as passing the 'bounds of conduct that will be tolerated by civilized society....' *Dean* at 307. Simply put, the actions of Allright do not rise to the level of extreme and outrageous behavior that Texas law and our prior interpretations of Texas law in *Wilson* and *Dean* require to support a claim for intentional infliction of emotional distress.

*Id.* at 1377.

The summary judgment evidence in the case at bar is insufficient to demonstrate a fact issue on the kind of conduct that is required for proof of intentional infliction of emotional distress. Clayton worked for Defendant for five years, over which period of time he was once called a "damn liar," was on some occasions yelled at for things that his managers erroneously thought he should have done or should not have done on the line where he worked, was criticized and disciplined at times for acts or omissions for which other employees or a previous shift of employees had actually been responsible, and was on two or three occasions the subject of efforts by his managers to elicit comments from other employees which were critical of Clayton's performance or which questioned his work-related injury. He made three visits to Dr. Silverblatt over a period of three years, one of which was for treatment of another matter, but each time he complained about headaches, and medicine was prescribed. His last visit to the doctor was on February 8, 1989, nearly a year and a half before his employment was terminated. No medical treatment is reported after November 9, 1989, seven or eight months before his employment ended.

The sum total of plaintiff's showing is simply inadequate to lift these facts out of the category of commonplace work-related disputes. Viewed in a light most favorable to Clayton, his managers during those five years appear to have been prone to yelling, were rude, accusatory and suspicious, inconsiderate, insulting, and unduly critical of Clayton, but their conduct was not so vile or reprehensible as to "go beyond all possible bounds of decency, ... to be regarded as atrocious, and utterly intolerable in a civilized community...." *Wilson v. Monarch Paper Co.*, 939 F.2d 1138, 1143 (5th Cir.1991). Moreover, none of the summary judgment evidence links Clayton's spell of headaches to any of Defendant's alleged conduct. Clayton has simply failed to demonstrate a genuine issue of material fact on his claim for intentional infliction of emotional distress.

### III. *Negligent Infliction of Emotional Distress*

That portion of the Memorandum and Recommendation of the Magistrate Judge, subtitled "Section V. Negligent Infliction of Emotional Distress," at pages 13–14, is approved and adopted as the opinion of the Court on the issue of negligent infliction of emotional distress.

### IV. *Conclusion*

ACCORDINGLY, Defendant Nabisco's Motion for Partial Summary Judgment is GRANTED in its entirety, and Plaintiff Clayton's claims (i) under Section 1981, (ii) for intentional infliction of emotional distress, and (iii) for negligent infliction of emotional distress, will be DISMISSED on the merits.

JUDGMENT will be entered accordingly. The Clerk will enter this Memorandum and Order and notify all parties.

SIGNED at Houston, Texas, on 7th day of August, 1992.