**Tammy J. GEARHART, Plaintiff,**

v.

**EYE CARE CENTERS OF AMERICA, INC. d/b/a EyeMasters and Thomas L. Donahue, Defendants.**

Civ. A. No. H–93–2079.

United States District Court, S.D. Texas.

May 30, 1995.

John Mitchell Williams, Luttrell Armstrong & Williams, Houston, TX, for plaintiff.

Paul E. Hash, Wickliff & Hall, Houston, TX, for defendant EyeMaster.

Joseph G. Galagaza, Neel Hooper & Kalmans, Houston, TX, for defendant Donahue.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is Defendant Eye Care Centers of America, Inc. d/b/a EyeMasters' ("EyeMasters") Motion for Summary Judgment (# 33) and Plaintiff Tammy J. Gearhart's ("Gearhart") Response and Cross–Motion for Partial Summary Judgment (# 41). EyeMasters seeks summary judgment on Gearhart's claims of sexual harassment, retaliation, and intentional infliction of emotional distress. Gearhart seeks partial summary judgment on her sexual harassment claim.

Having reviewed the motions, the submissions of the parties, the pleadings, and the applicable law, this court is of the opinion that EyeMasters' motion for summary judgement should be granted and that Gearhart's motion for partial summary judgement should be denied.

I. *Background.*

On July 13, 1992, Gearhart was hired by EyeMasters as an eyewear specialist at The Commons store location. Gearhart was supervised by the general manager of The Commons store, Thomas L. Donahue ("Donahue"), and the retail manager of The Commons store, William Drew Davis ("Davis"). Davis' immediate supervisor was Donahue, and the district manager, Elizabeth Knight ("Knight"), was Donahue's supervisor. Knight's office was located in The Commons store, and she retained final approval authority to hire, fire, and promote employees.

On August 19, 1992, Gearhart met with Knight and gave her a written letter of complaint alleging that Donahue and Davis had been sexually harassing her. Knight asked Gearhart if she would be comfortable remaining at The Commons store if Donahue were not present. Gearhart indicated that she would be comfortable remaining in the store pending an investigation as long as she did not have to work around Donahue. Knight further inquired whether Gearhart had any problems working around Davis, to which Gearhart indicated that she did not and that her main problem was with Donahue. According to Knight, she informed Gearhart that Donahue would be removed from the store during the investigation.

On August 19, Knight advised Donahue that he should work at another store location pending an investigation. Instead, Donahue elected to take personal vacation days until the investigation was completed. Later that same day, Davis informed Knight that Gearhart was too upset to continue working that day and wanted to leave work, which Knight allowed.

On August 20, Gearhart telephoned Knight, stating that she felt uncomfortable continuing to work at The Commons. Gearhart also mentioned to her that Davis' presence was a concern. Knight offered Gearhart the option of working in a store directly across the street in Willowbrook Mall, a store several miles away in a strip center off the Katy Freeway, or remaining at The Commons location. Gearhart decided to work at the store across the street. After working approximately one and one-half hour, Gearhart called Knight and told her that she felt uncomfortable working at that store also and could not keep her mind on work. Knight allowed Gearhart to take a leave of absence, with pay, and asked Gearhart to meet her at

the Willowbrook Mall store on August 22 to discuss the investigation.

Knight conducted an investigation on August 20 and 21, 1992, by interviewing all employees at The Commons store, including Davis and Donahue. Although Knight was unable to substantiate any of Gearhart's allegations against Davis, Knight orally reprimanded him and placed a written admonishment in his employee file. On August 22, 1992, Knight met with Donahue and accepted Donahue's resignation effective immediately. Following her meeting with Donahue, Knight went to the Willowbrook Mall store to discuss the outcome of the investigation with Gearhart. Gearhart, however, had not reported to work. When Knight returned to The Commons store, Knight received a certified letter from Gearhart in which she resigned her employment with EyeMasters effective August 21, 1992.

On November 23, 1992, Gearhart filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging sexual harassment and retaliation. After the EEOC issued Gearhart a right to sue letter, she initiated this action in state court on June 18, 1993, alleging claims of hostile work environment and *quid pro quo* sexual harassment, retaliation, and intentional infliction of emotional distress. Subsequently, EyeMasters removed the action to this court.

On November 23, 1994, EyeMasters filed the instant motion for summary judgment on all of Gearhart's claims. Gearhart subsequently filed a response and a cross-motion for partial summary judgment on her claim of hostile work environment sexual harassment. In her response, Gearhart withdrew her claims against EyeMasters for *quid pro quo* sexual harassment and retaliation and dismissed with prejudice all claims against Davis. This was evidenced by an agreed motion for partial dismissal between Gearhart, Davis, and EyeMasters, which this court granted on January 10, 1995. Thus, the only remaining claims against EyeMasters are those of hostile work environment sexual harassment and intentional infliction of emotional distress.

## II. *Analysis.*

### A. *The Applicable Standard.*

■ Rule 56(c) provides that "[summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Williams v. Adams,* 836 F.2d 958, 960 (5th Cir.1988). Once a proper motion has been made, the non-moving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial. *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514–15; *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552.

### B. *Intentional Infliction of Emotional Distress.*

■ To prevail on her claim of intentional infliction of emotional distress, Gearhart must establish: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused her emotional distress; and (4) the emotional distress suffered by her was severe. *MacArthur v. University of Tex. Health Ctr.,* 45 F.3d 890, 898 (5th

Cir.1995); *McKethan v. Texas Farm Bureau,* 996 F.2d 734, 742 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 694, 126 L.Ed.2d 661 (1994); *Ugalde v. W.A. McKenzie Asphalt Co.,* 990 F.2d 239, 243 (5th Cir. 1993); *Ramirez v. Allright Parking El Paso, Inc.,* 970 F.2d 1372, 1375 (5th Cir.1992); *Johnson v. Merrell Dow Pharmaceuticals, Inc.,* 965 F.2d 31, 33 (5th Cir.1992); *Dean v. Ford Motor Credit Co.,* 885 F.2d 300, 306 (5th Cir.1989); *Wornick Co. v. Casas,* 856 S.W.2d 732, 734 (Tex.1993).

[5] While "extreme and outrageous," as used in the second element of this standard, is an amorphous phrase that escapes precise definition, there appears to be a consensus that conduct is "outrageous" if it is "atrocious" and surpasses "all possible bounds of decency," such that it is "utterly intolerable in a civilized community." *See MacArthur,* 45 F.3d at 898; *Ugalde,* 990 F.2d at 243; *Johnson,* 965 F.2d at 33; *Dean,* 885 F.2d at 306; *Wornick,* 856 S.W.2d at 734. In *Dean,* the Fifth Circuit (citing Restatement (Second) of Torts § 46, comment d (1965)) stated:

> Liability [for outrageous conduct] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.... Generally, the case is one in which a recitation of the facts to an average member of the community would lead him to exclaim, "Outrageous."

885 F.2d at 306. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *Ugalde,* 990 F.2d at 243; *Johnson,* 965 F.2d at 33; *Wilson v. Monarch Paper Co.,* 939 F.2d 1138, 1143 (5th Cir.1991). There is no occasion for the law to intervene in every case where someone's feelings are hurt. *Id.*

■ Specifically, in the employment context, the Fifth Circuit, applying Texas law, has repeatedly stated that a claim for intentional infliction of emotional distress will not lie for "mere employment disputes." *MacArthur,* 45 F.3d at 898; *Johnson,* 965 F.2d at 33. The courts recognize that in order to manage its business properly, an employer must be able to supervise, review, criticize, demote, transfer, and discipline employees. *Id.* at 34; *Wilson,* 939 F.2d at 1143. Even conduct which may be illegal in an employment setting may not be the sort of behavior that constitutes "extreme and outrageous" conduct. *Ugalde,* 990 F.2d at 243.

■ In her original petition, Gearhart alleges that the "[d]efendants acted in an extreme and outrageous manner with the intention of causing Gearhart severe emotional stress, or with reckless disregard that it would probably cause Gearhart to suffer emotional distress and physical harm." Gearhart further alleges that "as a result of this intentional, reckless, extreme and outrageous conduct, Defendants actually did cause Gearhart to suffer severe emotional distress and physical harm." When asked about her claim for intentional infliction of emotional distress at her deposition, the following dialogue ensued:

Q. Let me ask you this. If it's not a fair statement, I want you to correct me. Is your factual basis for your intentional infliction claim essentially the same as your sex harassment claim and your retaliation claims?

A. Basically, yes.

Q. There are no additional facts that you know of that you believe support your claim for intentional infliction of emotional distress?

A. Right.

Gearhart, thus, relies on her sexual harassment allegations to support her claim for intentional infliction of emotional distress. Each of the incidents that Gearhart alleges supports her claim for sexual harassment is detailed in Gearhart's deposition testimony.

Gearhart's first allegation of misconduct is termed in her deposition the "sleep with the boss" incident. Gearhart asserts that shortly after she began working at EyeMasters, while she was taking a retail dispensing test, Davis began speaking of a vacation that he had planned as well as a long weekend he had coming up. Gearhart alleges that she asked Davis at what point she could get a weekend off, since her position required her to work every Saturday and every other

Sunday. According to Gearhart, Donahue was standing at the door and responded for Davis that she could be promoted into management, and thus gain a weekend off, "if you are sleeping with the boss." Gearhart additionally claims that Davis made the statement "which boss?" after which Gearhart quit taking the test, told Donahue "that was enough," and went back out to the retail floor. Gearhart's deposition elaborates further:

Q. Do you know if there was a management position open at that time?

A. I have no idea.

Q. Do you know if Mr. Donahue had any authority to promote you?

A. I have no idea.

Q. Did you take his statement to literally mean, "If you sleep with me, you'll get a promotion"? (sic)

A. Yes, I did.

Q. What made you believe he was serious?

A. I guess the way he said it.

Q. Please elaborate on that.

A. He had a—I don't know. I guess the look on his face, the serious look on his face when he said it, right after saying it, I guess.

The next occurrence of alleged impropriety that Gearhart recalled at her deposition was the "panty hose incident." On this occasion, Gearhart alleges that "Donahue made the comment that I should not wear dark panty hose anymore. And he went on speaking that dark panty hose cover up my legs. I should wear light ones." Gearhart contends that she thought at that time that perhaps it was an EyeMasters policy and said "okay." On that same day after lunch, Gearhart claims that Davis approached her and said " 'Oh, by the way, dark panty hose look nice on you, too.' "

Gearhart also alleges two incidents involving the magazine *Cosmopolitan*. On one occasion, Gearhart asserts that Donahue made comments to her and other employees, both male and female, in the break room about an article in *Cosmopolitan* entitled "Glorify your Bosom," which detailed how to achieve "perky breasts" by taking a cold shower. Gearhart describes the article in her deposition as showing a woman nude from the waist up taking a shower. Gearhart alleges that Donahue remarked that:

A. ... his wife was going out of town in a couple of weeks and that the *Cosmopolitan* magazines would be all he would need to keep him company.

\* \* \* \* \* \*

Q. Okay. And what comment, to the best of your recollection, can you specifically remember that Mr. Donahue made about the perky breasts article?

A. Oh, there, were just—like, for instance, if he was showing it to a male, he would make remarks about, "Look at it," and this and that. That was basically about it, showing it to everyone and making remarks about it and saying that his wife was going to be out of town; this was better than *Playboy* or *Penthouse*.

Gearhart alleges that this conversation offended her and she left the break room. Gearhart also asserts that on another occasion, Gearhart, Donahue, and another EyeMasters employee named Shea, were all in the break room when Donahue came across a page in a *Cosmopolitan* that was sticky. Gearhart contends that Donahue made a remark to Shea "... that he must have taken it in the rest room with him because his—Shea's wife did not sleep with him the night before." Again, Gearhart contends she found Donahue's comment offensive and left the break room.

The next incident Gearhart recalls was an occasion when Donahue allegedly touched her breast with his hand. Gearhart states in her deposition that she had entered the lab to request permission from Donahue to drive across the street to the Willowbrook Mall EyeMasters store to pick up a pair of glasses for a customer. Gearhart states in her deposition:

A. When I walked up to him and I asked him, I turned around in the opposite direction; and he turned around with me and put his arm around me. And his hand rested on the side—he was here, so

it would be on the right side of my breast.

Q. Okay. Let me make sure. He was standing on your left side?

A. He was standing on my left side.

Q. He reached his arm around you, and his right hand was on the side of your breast?

A. Correct. He immediately told me he would do anything for me.

And I said, "Is it okay if I go?" I removed his hand and went like this, brushed it with my elbow; and I said, "Is it okay if I go and pick the glasses up? The patient is waiting."

And he said, "Yes," and I immediately left.

Gearhart contends that Davis, as well as other lab employees, were in the room, but she does not know if they saw this "breast touching" incident.

On another occasion, Gearhart alleges that Donahue approached her when she was putting patient files away and touched her hair. In her deposition, Gearhart describes the "hair touching" incident as follows:

A. ... He came up behind me and pulled my hair like this and was playing with my hair, and I had to turn sideways to get him to stop. He left the room, and I continued putting my files away.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Okay. Did Mr. Donahue say anything at this time?

A. Just told me I had beautiful hair and picked it up off my shoulders.

Q. What did you say to him when he told you you had beautiful hair?

A. I do not recall saying anything. I just moved my head to the—see, I was standing up this way. I moved my head to the right.

Q. To basically pull your hair away from his hands?

A. Correct.

Q. Did you tell him not to do that?

A. I do not remember what was said.

Gearhart further alleges that Gearhart, Donahue, and two other EyeMasters employ-ees, Shea and Denise, were in the dispensing area of the store when Donahue told a story about his neighbor's breasts. When asked about the "neighbor's breasts" incident at Gearhart's deposition, the following dialogue ensued:

A. ... she would lay out in her backyard with her bathing suit top off and that he would see her. And he made remarks, you know, about her.

And that he had gone to—

Q. What remarks about her did he make?

A. Her large breasts, her breasts stuck out, this and that. He said that he received a package for the individual—she was not home, so they had taken it to his house—And that he went to deliv-er it and that she answered the door without a low—like, a robe-type thing, coverup, and that it came open and she looked down and her face turned red. And he said that before he left it was back open again.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. ... I want you to give me specifics about this incident. He told you that this lady's blouse or robe came open again?

A. Correct. And she looked down, and she was embarrassed. She pulled it back again, and before he left it was back open and that he had to rush away because he was getting hot.

Gearhart alleges that this conversation of-fended her; however, she does not remember saying anything to Donahue.

The next occasion that Gearhart recalls in her deposition is when Donahue allegedly kicked her in the buttocks as she was leaving for lunch. According to Gearhart, the inci-dent took place as follows:

A. The next incident would be the day that I was going to lunch ... Mr. Tom Donahue asked me where I was going, and I told him that the girl before me had came (sic) back early from lunch and it was my turn to go because I was scheduled after her. We had a schedule of who went to lunch when and whatev-er. I was—the time clock is here. I was facing it, put my card in, clocked

out, turned around this way; and Tom Donahue was here. He walked away, and he kicked me in my buttocks in a backward position. He was standing like this.

Q. When you say "like this," it's not clear on the record. You need to—

A. Well, how can I say it? Okay.

He was looking sideways, like a sideways position, towards the left. Okay? My back was to him. He kicked me in my buttocks, and I turned and looked. I remember the look on my face was I was shocked. He is a nice-sized man, as you can tell; and Cassandra Billings—I didn't say anything because I was shocked. Cassandra Billings looked at him and said, "Tom," like that. I turned around, walked off, went to lunch, came back. . . .

Gearhart alleges that the "butt kick" incident occurred in the presence of Davis and another EyeMasters employee, Cassandra Billings.

As further evidence of misconduct, Gearhart asserts that on one occasion, while helping Donahue look for an insurance manual and put together employee schedules, they went to Knight's office, where Donahue allegedly told Gearhart to go into the office. Gearhart asserts that Donahue turned off the lights as she walked toward the office door, and said, "Go ahead and go on in." According to Gearhart, she said, "No," and waited until Donahue turned the lights on before she went inside. In her deposition, Gearhart elaborates on this "lights out" incident:

A. So basic—well, after all the things that he had done previously, why else would he turn the light off in the office?

Q. You are assuming he meant something sexual by that?

A. Correct.

Q. He didn't say anything sexual?

A. No.

Q. Didn't touch you?

A. No.

The final incident that Gearhart recalled in her deposition occurred early in her employment with EyeMasters. Gearhart alleges that Donahue and Davis once discussed with her skirt measurements. Gearhart recalled the conversation as follows:

A. —that the women wear to the office, I was told by Drew and Mr. Donahue that they would do the measurements. If any of the girls came to work and, per se, they had a skirt or a dress that was above two inches above the knee, that they would do the measurements for it.

Gearhart states that she does not recall how the conversation was initiated. She admits though that there was no issue as to her skirt being too short or if she was in compliance with the dress code because her "skirts were always by the knee or below the knee."

Gearhart alleges that as a result of the actions of the people at EyeMasters she suffered "mental anguish or emotional trauma." Gearhart was questioned at her deposition about the extent of such mental anguish or trauma:

Q. How did this mental anguish or emotional trauma manifest itself?

A. Basically, I guess the only thing I could think of was what had happened at work. It was something that I went to bed thinking about it, woke up thinking about it. It was like a continuous thing.

Q. So the manifestation of your emotional trauma was that you thought about it a lot?

A. Correct.

Q. Anything else?

A. And I could see it in the way I reacted with my family, my nerves and so forth, the way I was eating. I lost weight.

Q. Approximately what date did this weight-loss start to manifest itself?

A. I would say it started about the last two weeks I was with EyeMasters. My appetite decreased tremendously.

Q. Any other?

A. No, not that I can think of.

Q. Have you seen any doctors or counselors or any other kind of health-care professional provider about this mental anguish?

A. No.

Thus, Gearhart does not allege that she contracted any type of mental disorder or

sought medical, psychological, or psychiatric treatment as a result of the defendants' conduct.

While behavior prohibited by Title VII should not go unaddressed, the law does not envision that every claim for sexual harassment will also establish intentional infliction of emotional distress. Clearly, the conduct alleged by Gearhart is far less egregious than other actions found not to constitute intentional infliction of emotional distress as a matter of law in a number of situations. *See, e.g., Ramirez*, 970 F.2d at 1376–77; *Johnson*, 965 F.2d at 34; *Guthrie v. Tifco Indus.*, 941 F.2d 374, 379 (5th Cir.1991), *cert. denied*, 503 U.S. 908, 112 S.Ct. 1267, 117 L.Ed.2d 495 (1992); *Clayton v. Nabisco Brands, Inc.*, 804 F.Supp. 882, 888 (S.D.Tex. 1992); *Horton v. Montgomery Ward & Co.*, 827 S.W.2d 361, 369 (Tex.App.—San Antonio 1992, writ denied). The isolated remarks at issue here, which could, at worst, be construed as sexual innuendo, are insufficient to satisfy the standard set forth by the Restatement (Second) of Torts § 46, comment d (1965), as adopted by Texas state and federal courts. The statements attributed to Donahue and Davis are more analogous to "mere insults, indignities, threats, annoyances, or petty oppressions" to which liability does not attach. *See Ugalde*, 990 F.2d at 243. Only in the most unusual of cases does the conduct move out of the "realm of an ordinary employment dispute," into the classification of "extreme and outrageous," as required for the tort of intentional infliction of emotional distress. *Prunty v. Arkansas Freightways, Inc.*, 16 F.3d 649, 654 (5th Cir.1994) (quoting *Dean*, 885 F.2d at 307).

The alleged conduct of Donahue and Davis, while perhaps offensive and disrespectful, is not so vile or reprehensible to be regarded as being beyond "all possible bounds of decency" or "utterly intolerable in a civilized community." *See MacArthur*, 45 F.3d at 898; *Clayton*, 804 F.Supp. at 888; *Wornick*, 856 S.W.2d at 734. Furthermore, conduct similar to that alleged by Gearhart has been found insufficient to state a claim for intentional infliction of emotional distress as a matter of law. *See Garcia v. Andrews*, 867 S.W.2d 409 (Tex.App.—Corpus Christi 1993, no writ).

Moreover, Gearhart has not shown that any emotional distress that she may have suffered is "so severe that no reasonable [person] could be expected to endure it." *K.B. v. N.B.*, 811 S.W.2d 634, 640 (Tex. App.—San Antonio 1991, writ denied), *cert. denied*, 504 U.S. 918, 112 S.Ct. 1963, 118 L.Ed.2d 564 (1992); *Benavides v. Moore*, 848 S.W.2d 190, 195 (Tex.App.—Corpus Christi 1992, writ denied). She does not claim to have experienced any psychiatric problems, like those encountered by the plaintiff in *Johnson*, or even any headaches, such as those suffered by the plaintiff in *Clayton*, stemming from the defendants' actions. *See Johnson*, 965 F.2d at 33; *Clayton*, 804 F.Supp. at 885. Gearhart certainly is not suffering from anything approaching the possibly suicidal, reactive depression experienced by the plaintiff in *Wilson*. *See Wilson*, 939 F.2d at 1141.

Thus, Gearhart has failed to adduce specific facts sufficient to support two of the required elements of an intentional infliction of emotional distress claim under Texas law—extreme and outrageous conduct and severe emotional distress. Accordingly, Gearhart's intentional infliction of emotional distress claim must fail.

### C. *Hostile Work Environment Sexual Harassment.*

A hostile work environment requires the existence of severe or pervasive and unwelcome verbal or physical harassment because of a plaintiff's membership in a protected class. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66–67, 106 S.Ct. 2399, 2405–2406, 91 L.Ed.2d 49 (1986); *Sischo–Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1109 (9th Cir.1991); *Young v. Will County Dep't of Public Aid*, 882 F.2d 290, 294 (7th Cir.1989); *Jones v. Flagship Int'l*, 793 F.2d 714, 719–20 (5th Cir.1986), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987). Title VII of the Civil Rights Act of 1964 ("Title VII") makes it illegal for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges

of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Two principal theories of sexual harassment may be shown under Title VII: *quid quo pro* discrimination and hostile work environment. *See Meritor Sav. Bank,* 477 U.S. at 65, 106 S.Ct. at 2404–05. An employer may not require sexual favors from an employee as a *quid pro quo* for job benefits. *Jones,* 793 F.2d at 721. Hostile work environment sexual harassment occurs when an employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment." *Meritor Sav. Bank,* 477 U.S. at 65, 106 S.Ct. at 2404–05. In the instant case, Gearhart's claim is based on the latter theory.

 The Supreme Court recently affirmed that sexually discriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment that violates Title VII. *Harris v. Forklift Sys., Inc.,* — U.S. —, — – —, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993) (citing *Meritor Sav. Bank,* 477 U.S. at 65, 67, 106 S.Ct. at 2404–05, 2405–06). Whether the sexual conduct complained of is sufficiently pervasive to create a hostile or offensive work environment must be determined from the totality of the circumstances. *Id.* — U.S. at —, 114 S.Ct. at 371. In determining whether a work environment is abusive, a court should consider such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* The test is an objective, rather than a subjective, one. *See DeAngelis v. El Paso Mun. Police Officers Ass'n,* 51 F.3d 591, 594 (5th Cir.1995) (citing *Harris,* — U.S. at —, 114 S.Ct. at 370).

 The Fifth Circuit has set forth five elements necessary to establish a *prima facie* case of sexual harassment in the work place:

(1) the plaintiff belongs to a protected class;

(2) the plaintiff was subject to unwelcome sexual harassment;

(3) the harassment was based on sex;

(4) the harassment affected a term, condition, or privilege of employment; and

(5) the employer either knew or should have known of the harassment and failed to take prompt action.

*DeAngelis,* 51 F.3d at 593; *Nash v. Electrospace Sys., Inc.,* 9 F.3d 401, 403 (5th Cir. 1993); *see Cortes v. Maxus Exploration Co.,* 977 F.2d 195, 198–99 (5th Cir.1992); *Waltman v. International Paper Co.,* 875 F.2d 468, 477 (5th Cir.1989); *Dornhecker v. Malibu Grand Prix Corp.,* 828 F.2d 307, 309 n. 3 (5th Cir.1987); *Jones v. Flagship Int'l,* 793 F.2d at 719–20.

While it is undisputed that Gearhart belongs to a protected class because she is a female, Eyemasters argues that it is entitled to summary judgment on Gearhart's claim of hostile work environment sexual harassment because Gearhart has failed to establish the remaining elements for such an action—that she was subject to unwelcome sexual harassment, that the harassment was based on sex, and that EyeMasters knew or should have known of the harassment and failed to take prompt remedial action.

 Gearhart, on the other hand, in her response and motion for partial summary judgment, argues that she has satisfied each of the foregoing elements for hostile work environment sexual harassment. First, Gearhart contends that she was subject to unwelcome sexual harassment by Donahue and Davis. Gearhart's evidence of unwelcome sexual harassment, as noted above, includes the following allegations: the "sleep with the boss" incident; the "pantyhose" incident; the "*Cosmopolitan*" incidents; the "breast touching" incident; the "hair touching" incident; the "next door neighbor" incident; the "butt kick" incident; the "lights out" incident; and the "skirt measurement" incident. Thus, in the six-week period that Gearhart was employed with EyeMasters, Donahue and Davis allegedly made inappropriate comments to her, and on three occasions Donahue allegedly touched her in an offensive manner.

Even if taken as true, Gearhart's allegations are nothing more than some evidence of "flirting, some casual touching, and sexual innuendos or jokes." *Valdez v. Church's Fried Chicken, Inc.*, 683 F.Supp. 596, 620 (W.D.Tex.1988). Although the court does not condone Donahue's and Davis' alleged conduct in the instant case, it "was not as aggressive or coercive as that underlying a number of sexual environment claims that have been unsuccessful in court." *Dornhecker*, 828 F.2d at 309 (citing *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 615 (6th Cir. 1986), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987) (prolonged exposure to sexually hostile employee who was habitually vulgar and displayed nude photos at work); *Scott v. Sears, Roebuck & Co.*, 798 F.2d 210, 211 (7th Cir.1986) (plaintiff repeatedly propositioned); *Jones*, 793 F.2d at 719–20 (supervisor propositioned employee on three separate occasions while on business trips)). While Donahue's and Davis' conduct may have been inappropriate and "boorish," under current law, it does not rise to the level of an actionable claim for hostile work environment sexual harassment. *See Dornhecker*, 828 F.2d at 308.

■■■ To establish the third element, that the harassment was based on sex, Gearhart asserts in her response and motion for partial summary judgment that "[t]here is no evidence of complaints of similar conduct by either Donahue or Davis made by male employees...." Gearhart directly rebuts this assertion, however, in her response by alleging that "Donahue made a sexual remark about a male employee while Gearhart was present about a *Cosmopolitan* magazine have (sic) sticky pages that this male employee must be taking this magazine into the restroom with him because his girlfriend was not sleeping with him." Additionally, although Gearhart alleges that Donahue engaged in inappropriate behavior with other female employees of EyeMasters, she presents no summary judgment evidence that this was brought to the attention of EyeMasters prior to her own complaint. As judged by the totality of the circumstances set out in *Harris*, the acts alleged in this case do not even approach the level of egregiousness found in many reported Title VII sexually hostile environment claims. *See Harris*, ── U.S. at ── ── ──, 114 S.Ct. at 370–71. While the court does not condone Donahue's and Davis' alleged conduct, it was not as aggressive or coercive as that underlying a number of hostile environment claims in which the plaintiff did not prevail. *See Jones*, 793 F.2d at 720–21. Gearhart was not propositioned, forced to respond to Donahue or Davis, or placed in any threatening situations.

■■■ Gearhart contends that she has satisfied the fourth element of an actionable claim for hostile work environment sexual harassment because the alleged harassment affected a term, condition or privilege of her employment and resulted in an abusive work environment. A working environment is abusive "[w]hen the work place is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive working environment.'" *Harris*, ── U.S. at ──, 114 S.Ct. at 370 (quoting *Meritor Sav. Bank*, 477 U.S. at 65, 67, 106 S.Ct. at 2404–05, 2405–06). In the instant case, the work place was not "permeated" with discriminatory conduct, nor was it "severe or pervasive." *Id.* Casual or isolated manifestations of a discriminatory environment are not sufficient to demonstrate a hostile working environment under the law. *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1414 (10th Cir.1987).

■■■ Gearhart asserts that she has established the fifth element of a *prima facie* case of hostile work environment, alleging that EyeMasters had knowledge of the sexual harassment and did not take prompt remedial action. An employer becomes liable for sexual harassment only if it knew or should have known of the harassment and failed to take prompt remedial action. *Garcia v. Elf Atochem N. Am.*, 28 F.3d 446, 451 (5th Cir. 1994); *Nash*, 9 F.3d at 404 (citing *Jones*, 793 F.2d at 720). Gearhart can show actual notice by proving that she complained previously of the harassment to higher management. *Waltman*, 875 F.2d at 478. Knight attests in her affidavit that neither she nor any other supervisor or member of management of EyeMasters had received any complaints of

sexual harassment regarding Donahue or Davis prior to August 19, 1992. There is no evidence in the record to the contrary. Instead, Gearhart admits that she did not report any instances of alleged sexual harassment until August 19, 1992, when she met with Knight. Hence, EyeMasters had no actual notice of the purported sexual harassment.

■ Gearhart can demonstrate constructive notice by "showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge." *Id.* (quoting *Henson v. City of Dundee,* 682 F.2d 897, 899 (11th Cir.1982)). Gearhart argues in her response that EyeMasters knew or should have known of Donahue's and Davis' conduct because "employees with supervisory responsibilities can be considered 'agents' of the employer, notice to the employee can be considered notice to the employer of sexual harassment." Gearhart further attempts to distinguish between supervisor and co-worker liability. Some courts have distinguished between these two theories and have utilized different standards for assessing Title VII liability depending upon whether the harasser was a supervisor or a co-worker. Although it is unclear whether this distinction is followed in this Circuit, it is of no consequence if the employer takes prompt and adequate remedial action. Such corrective action can relieve an employer of liability under either theory. *Ryczek v. Guest Servs., Inc.,* 877 F.Supp. 754, 758 n. 2 (D.C.Cir.1993).

■ Finally, Gearhart claims that Davis, a supervisor, witnessed offensive sexual conduct on the part of Donahue towards Gearhart and participated in some objectionable conduct, and, therefore, EyeMasters knew or should have known of the offensive conduct by Donahue. According to Knight, Davis denied having any knowledge of Gearhart's complaints. Even if Davis saw some of this conduct, it is highly questionable whether the conduct witnessed by Davis, standing alone, constitutes actionable sexual harassment. As previously stated, "flirting, some casual touching, and sexual innuendos or jokes do not by themselves constitute actionable sexual harassment." *Valdez,* 683 F.Supp. at 620.

It is only the most serious of sexual harassment that can serve as the basis for relief under Title VII. *Id.*

■ Moreover, in the situation where an employer receives notice of alleged sexual harassment and makes a prompt remedial response to the complaint that is reasonably calculated to end the harassment, the employer is not liable for the sexual harassment, even if the conduct complained of in fact occurred. *See Carmon v. Lubrizol Corp.,* 17 F.3d 791, 794–95 (5th Cir.1994). "'What is appropriate remedial action will necessarily depend on the particular facts of the case—the severity and persistence of the harassment, and the effectiveness of any initial remedial steps.'" *Elf Atochem N. Am.,* 28 F.3d at 451 (quoting *Waltman,* 875 F.2d at 479). Thus, the focus should be on whether EyeMasters took prompt remedial action when confronted with Gearhart's complaint.

EyeMasters' response to Gearhart's complaint was prompt. Immediately after learning of her complaint on August 19, Knight inquired whether Gearhart would be comfortable remaining in The Commons store pending an investigation if Donahue were not present. Gearhart indicated that would be fine. When Knight asked Gearhart if she had any problem working with Davis, Gearhart said that would not be a problem because her difficulties were really with Donahue. Knight decided to remove Donahue from the store pending the investigation, and told Donahue on August 19 that he would have to work at a different store location, thus insuring that he would have no further contact with Gearhart at that time. Knight also allowed Gearhart to leave work on August 19 because she was upset. Then, on August 20, Gearhart decided to go across the street to work at the Willowbrook Mall store because she did not feel comfortable remaining at The Commons location. After a few hours, though, Gearhart called Knight because she reportedly still felt uncomfortable at that store, and Knight told her to take time off, with pay, and meet her on August 22 at the Willowbrook Mall store to discuss the investigation. Gearhart resigned before Knight had an opportunity to discuss the outcome of the investigation. Gearhart, how-

ever, acknowledges that she was subjected to no further harassment by Donahue or Davis after August 19, 1992.

Knight's handling of the situation was also decisive. On August 20 and 21, 1992, Knight conducted an investigation by interviewing all the employees at The Commons location individually. As previously noted, Knight was unable to corroborate Gearhart's allegations as to Davis. According to Knight's affidavit, "[n]one of the employees interviewed voiced any complaint about any action of Davis, nor had they witnessed any of the conduct regarding Davis complained of by Gearhart." Knight, however, verbally reprimanded Davis in order to increase his awareness of his responsibilities and placed a written reprimand in his file. Additionally, on August 22, Knight met with Donahue and accepted Donahue's resignation effective immediately.

Furthermore, EyeMasters has a sexual harassment policy that is included in its employee handbook, which prohibits sexual harassment in the work place and provides a mechanism for employees to make complaints about sexual harassment. EyeMasters' policy provides:

> Allegations of sexual harassment should be reported to a member of Management, the next level above the individual against whom you are making the complaint, or to the Vice President of Human Resources within 48 hours of the occurrence so that our investigation of the matter can be handled promptly and effectively.

It is undisputed that Gearhart received a copy of the employee handbook as part of the hiring process and signed an "employee statement" acknowledging that she had received a copy of the employee handbook and carefully read and fully understood the policies, rules, procedures, and other information contained in the handbook.

Gearhart does not directly contest EyeMasters' claim that Knight took prompt remedial action in response to Gearhart's complaint. Instead, Gearhart attempts to discredit Knight by outlining alleged inconsistencies in Knight's deposition testimony. The first inconsistency that Gearhart points to is Knight's statement in her affidavit that she told Gearhart that Donahue would be removed from the store pending the investigation. Knight, however, in her deposition, stated that she did not tell Gearhart that Donahue had been removed from the store. Gearhart argues that it is "contrary to common sense" to believe that Knight made the decision to remove Donahue during the interview with Gearhart without confronting Donahue. Gearhart also asserts that if Knight had decided to remove Donahue during her initial complaint interview on August 19, then there was no need for an investigation and that the only appropriate response was to fire Donahue. Gearhart further argues that she should not have been offered the option of working at alternative locations if the decision to remove Donahue had already been made. Moreover, Gearhart alleges that Knight conducted an insufficient investigation which is evidenced, according to Gearhart, by Knight's statement that she could not substantiate the claims against Davis, yet she placed a reprimand in Davis' file.

The alleged inconsistencies in Knight's testimony as asserted by Gearhart do not render Knight unworthy of belief. As EyeMasters correctly points out, without regard to what Knight told Gearhart, Donahue was removed from the store pending the investigation. In addition, Gearhart could have learned of Donahue's resignation had she herself not resigned on August 21. As for Knight's decision to separate Donahue from Gearhart, Knight states that it was her understanding that it was proper procedure to separate the parties involved immediately. There was no need for Knight to confront Donahue before making a decision to remove Donahue from the store during the investigation. Her decision to remove Donahue during the course of the investigation was not tantamount to a decision to remove him permanently. Knight's decision, however, insulated Gearhart from any additional harassment pending the outcome of the investigation. Moreover, Knight's offering Gearhart a position at another location occurred only after Gearhart told Knight that she felt uncomfortable at The Commons store even in the absence of Donahue. Finally, the contents of any reprimand Knight placed in

Davis' file do not establish an insufficient investigation or insufficient remedial action. In any event, if any error was made in the investigation of Davis, it favored Gearhart, as Davis was ultimately reprimanded although Knight could not substantiate the claims against him. Accordingly, Gearhart's assertions fail to rebut the evidence offered by EyeMasters showing that it acted promptly when responding to Gearhart's complaint.

■■■ "While *Harris* proclaims that sexually hostile or abusive work environments are no longer to be tolerated under Title VII, that fact does not transform Title VII into a strict liability statute for employers." *Nash,* 9 F.3d at 404. An employer is liable only if it knew or should have known of the employee's offensive conduct and did not take steps to repudiate that conduct and eliminate the hostile environment. *Id.* Gearhart has not adduced specific facts demonstrating that EyeMasters failed to take prompt remedial action after receiving notice of Gearhart's complaint, as required to establish employer liability for hostile work environment sexual harassment. Thus, Gearhart's hostile work environment sexual harassment claim must be rejected.

III. *Conclusion.*

There exist no outstanding issues of material fact with respect to Gearhart's claims of intentional infliction of emotional distress or hostile work environment sexual harassment, and EyeMasters is entitled to judgment as a matter of law. Accordingly, EyeMasters' motion for summary judgment is GRANTED, and Gearhart's motion for partial summary judgment is DENIED.

IT IS SO ORDERED.