David J. PATTON, et ux., Plaintiffs,

v.

UNITED PARCEL SERVICE, INC., United Parcel Service of Ohio, Inc., United Parcel Service of New York, Inc., United Parcel Service of America, Inc., Joe Liana, Bob Schultz and Clayton Clark, Defendants.

Civil Action No. H–94–2004.

United States District Court,
S.D. Texas.

Dec. 21, 1995.

J. Ronald Tucker, Tucker & Muller, Houston, TX, for Plaintiffs.

John K. Rentz and Teresa Valderrama, Baker & Botts, Houston, TX, for Defendants.

### MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court are Defendants United Parcel Service, Inc. ("UPS"), Joe Liana ("Liana"), Bob Schultz ("Schultz"), and Clayton Clark's ("Clark") Motion for Summary Judgment (# 41) and Defendants' Rule 12(b)(6) Motion to Dismiss Vera Patton's Claims for Failure to State a Claim (# 40).

Defendants seek summary judgment on David J. Patton ("David") and Vera Patton's ("Vera") (collectively the "Pattons") claims of reverse discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Texas Commission on Human Rights Act ("TCHRA"), Tex.Rev.Civ.Stat.Ann. art. 5221k (now recodified as Tex.Lab.Code § 21.001 et seq.), retaliation, constructive discharge, intentional infliction of emotional distress, defamation, invasion of privacy, wrongful discharge, and breach of the duty of good faith and fair dealing. The defendants also seek dismissal of Vera's federal and state law claims.

Having reviewed the motions, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that the defendants' motions should be granted.

### I. Background

On September 2, 1975, David, a white male, was hired by UPS. After serving in various capacities and receiving several awards, on August 9, 1993, David was demoted from his position of River Oaks Center Manager at the UPS Sweetwater facility in Houston, Texas, to on-car supervisor at the UPS Lakeside facility in Stafford, Texas.

While at the River Oaks Center office on August 3, 1993, Dave Norstrom ("Norstrom"), the Inwood Center Manager, and Mike Cummins ("Cummins"), the Inwood Center Supervisor, mentioned to David that there were some new "souvenir" baseballs with "UPS" embossed on them. David told them that if they were able to obtain any of the baseballs he would like to have or see one. Later that day, David was talking on the telephone in the center office area, with his back to the door, when someone came inside and placed a white box on the counter/desk beside where he was sitting. According to David, he did not immediately turn around to see who had entered the office. A few minutes later, David turned around, and about that time, James Turner ("Turner"), the River Oaks Center Supervisor, entered the center office area. David asked Turner if he had brought the white box, to which Turner responded negatively. After noticing that the seal on the box had been broken, David opened the box and found a UPS baseball made in China and a sheet of blister-bubble plastic, with a note that said, "Congratulations, Shipper. We're glad that you've been involved in this test for UPS." After David and Turner looked at the ball, David told Turner that Norstrom or Cummins must have left it for him. Subsequently, David put the ball back into its original white box and left it sitting on the counter/desk in the center office. Unknown to David, Turner later put the baseball in David's personal office after David had left work for the day.

On August 4, 1993, sometime after lunch, David received a call from Norstrom asking David what he had done with the baseball he had given him. Norstrom advised David that Loss Prevention was searching for missing baseballs. David asked Turner where the white box was, and Turner said that he had placed the box in David's personal office the night before. According to David, he immediately went into his office and found the box sitting on his desk. David then took the box to Loss Prevention Supervisor, Jerry McGee ("McGee"), and said, "Here, I think this is what you're looking for." According to David, McGee responded, "Yes. Yes, we're looking for those baseballs." A few minutes later, Sharon Sylvie ("Sylvie"), Loss Prevention Manager, approached David in his office and asked him who had given him the baseball. David responded, "I really can't say."

The following afternoon, August 5, 1993, Clark, the Division Manager, went to David's office and asked him who had given him the baseball. David declined to answer. According to Clark, he told David that he needed to know who had been involved in remov-

ing the package(s) from their storage location. David again failed to answer Clark's question. Instead, Clark claims that David stated that he had talked with the individual and that he believed the person had no additional knowledge. Clark ended the meeting.

On Friday, August 6, Clark met with David again and asked him for the name of the person involved. David again refused to divulge the name. Clark informed David that he had no intention of disciplining the individual involved. Clark instructed David to tell him the name. Clark contends that David refused, stating that his loyalty to a "partner" prevented him from following the instruction. Clark maintains that he informed David that his loyalty was misplaced and that he could in fact lose his job for refusing to follow instructions. Clark then told David to report to the office of Liana, the Southeast Texas District Manager. David met with Liana, Clark, and Claude Anderson, the District Loss Prevention Manager, in Liana's office. Liana asked David who had brought the baseball to his office. According to Liana, David responded by saying that he would not sell out a partner. Liana claims that he told David that as a partner in UPS he was expected to cooperate during an investigation and that he had a duty to answer questions specifically pertaining to this incident or any other incident. Liana also told David nothing would happen to the person who gave him the baseball. After David refused to answer his question, Liana told David to go home and think about the situation and report back to him on Monday morning. Liana advised David that Clark had recommended that David be demoted and that unless David answered Liana's question, he would go along with that recommendation.

On Saturday, August 7, Norstrom telephoned David at home and said that he would come forward and explain that he had put the baseball in David's office. Norstrom attempted to telephone Sylvie at home but was unable to reach her. On Sunday night, Norstrom reached Sylvie by telephone and told her that he had brought the baseball to David. Sylvie called him back that evening and told him to meet with Clark and her on Monday morning.

On Monday morning, August 9, 1993, Norstrom met with Sylvie and Clark and admitted placing the baseball in David's office. No adverse action was taken against Norstrom as a result of this incident. Norstrom then told David what he had told management. Afterwards, David met with Schultz, the Human Resources Manager, and Clark. Schultz and Clark once again asked David who had given him the baseball. David still refused to answer. Liana met with David again in the presence of Anderson, Schultz, and Clark. When Liana asked David if he was going to tell them who had given him the baseball, David said, "I'm sorry, but I can't do that." David contends that because they already knew that information, there was no point in telling them. After David's final refusal to cooperate, Liana told David to take off the rest of the week and that he would be reassigned on Monday, August 16.

On August 16, David met with Schultz and Liana and, due to his refusal to cooperate, was demoted one level to an on-car supervisor. David was transferred to the Lakeside facility in Stafford, Texas, because the center was short-handed and needed supervisors. David's supervisor at the Lakeside facility was Mike Morrison ("Morrison"). David's salary of $4,500.00 per month did not change as a result of his demotion and reassignment.

On September 9, Morrison told David that there was a problem with his August expense report. David had sought reimbursement for the mileage difference between the Sweetwater and Stafford facilities. The Stafford facility is approximately fifty miles from David's home in Spring, Texas. Morrison refused to reimburse David and referred his questions to Schultz. On September 16, David telephoned Schultz, who confirmed that UPS does not reimburse employees for differences in mileage when transferred to a new assignment. David protested, claiming that he had been reimbursed in the past when his office had been moved from Sweetwater to Stafford. Schultz informed David that if that were the case, it was a mistake and should not have occurred. Therefore, David's request for reimbursement of mileage traveling to and from work was denied

by UPS. The Pattons contend that this amounted to a $350.00 per month pay cut.

By letter dated September 17, 1993, David informed Liana of his resignation effective October 1, 1993. David's letter stated that his resignation was "[d]ue to both family and financial hardships incurred as a result of being transferred across Houston to the Stafford Building following your demotion of me without just cause...."

On November 1, 1993, David filed a charge against UPS with the Equal Employment Opportunity Commission ("EEOC") claiming that he had been discriminated against in violation of Title VII on the basis of sex. David's EEOC charge was amended on November 22, 1993, to include allegations of discrimination on the basis of race, color, sex, retaliation and disparate treatment. After the EEOC issued David a right to sue letter, the Pattons initiated this action on June 13, 1994.

## II. *Analysis*

### A. *David Patton's Claims*

### 1. *The Standard for Summary Judgment*

■ Rule 56(c) provides that "[summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Williams v. Adams,* 836 F.2d 958, 960 (5th Cir.1988). Once a proper motion has been made, the non-moving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial. *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. at

2552; *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2515; *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). The controverted evidence must be viewed in the light most favorable to the non-movant and all reasonable doubts must be resolved against the moving party. *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990); *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513. Summary judgment is mandated if the non-movant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552. "In such situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23, 106 S.Ct. at 2552.

### 2. *Title VII of the Civil Rights Act*

#### a. *Prima Facie Case*

■ The United States Supreme Court has expressly recognized that white persons have standing to sue under Title VII for race discrimination in private employment. *See McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 280, 96 S.Ct. 2574, 2578, 49 L.Ed.2d 493 (1976). "The Act prohibits *all* racial discrimination in employment, without exception for any group of particular employees...." *Id.* at 283, 96 S.Ct. at 2580.

■ In *McDonnell Douglas* and *Burdine,* the Supreme Court outlined the framework for establishing a *prima facie* case in Title VII cases. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The United States Court of Appeals for the Fifth Circuit, however, has refined the test for claims of reverse race discrimination. To prove an allegation of reverse race discrimination, the plaintiff must show: "(1) that he belongs to a racial minority within the company; (2) that he was terminated from a position for which he was qualified;

and (3) that he was replaced with someone not in his protected class." *Switzer v. Texas Commerce Bank,* 850 F.Supp. 544, 547 (N.D.Tex.), *aff'd without opinion,* 42 F.3d 642 (5th Cir.1994) (citing *Flanagan v. Aaron E. Henry Community Health Serv. Ctr.,* 876 F.2d 1231, 1233 (5th Cir.1989)). Recently, in *Singh v. Shoney's, Inc.,* a case involving a white supervisor's claim of race discrimination under 42 U.S.C. § 1981, the Fifth Circuit discussed the *prima facie* elements for a reverse discrimination case. 64 F.3d 217, 219 (5th Cir.1995). In *Singh,* the court stated, "[i]n order to make out a prima facie case of discrimination a plaintiff alleging discriminatory discharge must show (1) that she is a member of a protected group; (2) that she was qualified for the job that she formerly held; (3) that she was discharged; and (4) that after her discharge, the position she held was filled by someone not within her protected class." *Id.* Hence, the Fifth Circuit may have retreated from its previous holding in *Flanagan* that the plaintiff must belong "to a racial minority within the [employer]," now requiring as an element only that the plaintiff be "a member of a protected group." *See id; Flanagan,* 876 F.2d at 1233. In *Singh,* however, the facts suggest that Singh may have belonged to a racial minority within the particular restaurant at which she worked. *See Singh,* 64 F.3d at 218.

 At all times, the plaintiff has the ultimate burden to prove race discrimination. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *Marcantel v. Department of Transp. & Dev.,* 37 F.3d 197, 200 (5th Cir.1994). Once a *prima facie* case is established, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Id.; McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824. If the employer meets its burden, the *prima facie* case is dissolved, and the burden shifts back to the plaintiff to establish that the reason proffered by the employer is merely a pretext for discrimination. *Id.; Rhodes v. Guiberson Oil Tools,* 39 F.3d 537, 542 (5th Cir.1994); *Marcantel,* 37 F.3d at 200; *Moham v. Steego Corp.,* 3 F.3d 873, 875 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994). To demonstrate a "pretext for discrimination," the plaintiff must show both that the employer's proffered reason was false and that race discrimination was the real reason. *See St. Mary's Honor Ctr.,* 509 U.S. at ——, 113 S.Ct. at 2752; *Rhodes,* 39 F.3d at 542.

 An employee's own subjective belief of race discrimination, however genuine, cannot serve as the basis for judicial relief. *Little v. Republic Ref. Co.,* 924 F.2d 93, 96 (5th Cir.1991); *Sherrod v. Sears, Roebuck & Co.,* 785 F.2d 1312, 1316 (5th Cir.1986); *Hornsby v. Conoco, Inc.,* 777 F.2d 243, 246 (5th Cir.1985); *Elliott v. Group Medical & Surgical Serv.,* 714 F.2d 556, 567 (5th Cir. 1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984). Although Title VII, and similarly, the TCHRA, protects employees against racial discrimination in the terms and conditions of employment, it does not afford minorities special preference or place upon the employer an affirmative duty to accord them special treatment. *See Williams v. General Motors Corp.,* 656 F.2d 120, 129 (5th Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982). Furthermore, the employment discrimination laws are "not intended to be a vehicle for judicial second-guessing of business decisions, nor ... to transform the courts into personnel managers." *Bienkowski v. American Airlines, Inc.,* 851 F.2d 1503, 1507–08 (5th Cir.1988); *see also Waggoner v. City of Garland,* 987 F.2d 1160, 1165 (5th Cir.1993); *Thornbrough v. Columbus & Greenville R. Co.,* 760 F.2d 633, 647 (5th Cir.1985); *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 576–78, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978).

 In the instant case, it is undisputed that David is white, that he resigned, and that he was qualified for the position. It also undisputed that David does not belong to a racial minority within the management ranks of the employer. *Flanagan,* 876 F.2d at 1233; *Switzer,* 850 F.Supp. at 547. In fact, the affidavit of Mike Lazarte ("Lazarte"), the Employment Manager for the Southeast Texas District, indicates that there were 68 managers in the district in 1992, 67 managers in 1993, and 74 managers in 1994. Lazarte states that of those, in 1992, 51 were white;

in 1993, 48 were white; and in 1994, 54 were white. Based on Lazarte's affidavit, it is apparent that white employees hold the majority of management positions in the Southeast Texas District—the district within which David was employed. Thus, under *Flanagan,* the Pattons have failed to establish the first element of a *prima facie* case of reverse race discrimination.

■ The Pattons have likewise failed to establish the fourth element of a *prima facie* case—that David was replaced by a person outside of his protected class. Rather, Lazarte's affidavit indicates that David's center manager duties were transferred to four white UPS employees. The Pattons attempt to sidestep this issue by arguing that Lazarte's affidavit is unreliable and irrelevant. The Pattons, however, never contest the fact that David was replaced by four white employees.

In addition, the defendants contend that because David voluntarily resigned on September 17, 1993, the Pattons cannot establish the third element of a *prima facie* case—that in spite of his qualifications he was discharged. David admitted at deposition that he was not terminated. Instead, the Pattons argue that David was constructively discharged from UPS on October 1, 1993.

### b. *Constructive Discharge*

■ A constructive discharge occurs when an employer makes an employee's working conditions so intolerable that a reasonable employee would have felt forced to resign. *Boze v. Branstetter,* 912 F.2d 801, 804 (5th Cir.1990); *Junior v. Texaco, Inc.,* 688 F.2d 377, 378 (5th Cir.1982); *Young v. Southwestern Sav. & Loan Ass'n,* 509 F.2d 140, 144 (5th Cir.1975). To determine whether a constructive discharge has occurred, the plaintiff's actions must be analyzed from the standpoint of a "reasonable employee." *Boze,* 912 F.2d at 804; *Bourque v. Powell Elec. Mfg. Co.,* 617 F.2d 61, 65 (5th Cir.1980). The working conditions must have been "so difficult or unpleasant that [a] reasonable person in [the plaintiff's] shoes would have felt compelled to resign." *McKethan v. Texas Farm Bureau,* 996 F.2d 734, 741 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 694, 126 L.Ed.2d 661 (1994) (citing *Ugalde v. W.A. McKenzie Asphalt*

*Co.,* 990 F.2d 239, 242 (5th Cir.1993)). The plaintiff's actions must be evaluated objectively, without regard to the "employee's subjective preference for one position over another." *Epps v. NCNB Texas,* 7 F.3d 44, 46 (5th Cir.1993) (citing *Jett v. Dallas Indep. Sch. Dist.,* 798 F.2d 748, 755 (5th Cir.1986), *remanded in part on other grounds,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)).

In this case, the Pattons assert in their response that "UPS deliberately transferred David Patton to a position with such intolerable working conditions that he was forced to resign...." The Pattons claim the following allegedly intolerable working conditions: (1) David was not qualified for his new position; (2) David had to spend more time driving a longer distance to work each day; (3) David had to work harder, with longer hours, than in his previous position; and (4) David's health precluded him from enduring the stress and physical strain of this new position.

David claimed at deposition that he was forced to resign because he was demoted to on-car supervisor and transferred to the Stafford facility. David contends that he was not qualified for the new position because he had never trained a package car driver. In addition, David alleges that he had to drive an hour and a half in heavy traffic to get to work and at least an hour home every night without reimbursement for the mileage, which allegedly cost him an additional $350.00 per month. David further contends that his coworkers treated him differently than they did when he was a manager, claiming that people were "shunning" him. David stated at deposition that he did not have a valid Department of Transportation ("DOT") certification card to drive and that his blood pressure was "sky high." The Pattons also assert in ¶ 24 of their First Amended Original Petition that David's "health was such that he could not physically perform the duties of an on car supervisor and his annual compensation was significantly reduced."

The defendants maintain that, even if true, none of David's complaints reflects working conditions imposed by UPS that were so offensive that a reasonable person in David's shoes would have felt compelled to resign.

David stated at deposition that he thought the reason he was sent to Stafford as an on-car supervisor was because they were short-handed. David admitted that at UPS "you go where you're needed." As for David's not being reimbursed for mileage, Morrison testified at deposition that he rejected David's mileage claim because it was his understanding that there was no compensation for driving from one's home to one's place of business or work. Further, David's base salary was not reduced, even though his level of responsibility was decreased. Although David claims that his stock distribution was affected, he admits that he resigned before he found out whether he would receive fewer stock units for the year. According to Liana, because David had worked most of the year as a manager, he most likely would have received two units of stock, the usual amount for a manager. As for David's allegations of medical problems, David's DOT certification card was reinstated in September 1993 by Dr. Strauss. According to the defendants' unrefuted evidence, none of David's managers knew that David had allowed his DOT certification to lapse or of his alleged health problems. Thus, from UPS's standpoint, there was no apparent reason that David would have any problem performing the on-car supervisor job. Finally, the defendants contend that David has never produced any evidence of medical restrictions on his ability to function, either at the time of his transfer or during the course of this lawsuit.

▮▮▮ As to the Pattons' claim of intolerable working conditions, the challenged working conditions must be viewed objectively by examining the specific conditions imposed by UPS, not by viewing David's state of mind. *Epps,* 7 F.3d at 46 (citing *Jett,* 798 F.2d at 755)); *Shawgo v. Spradlin,* 701 F.2d 470, 481 n. 12 (5th Cir.), *cert. denied,* 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 345 (1983). As the United States Court of Appeals for the Fourth Circuit noted:

> Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. He is not,

however, guaranteed a working environment free of stress.

*Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986). To prevail, however, the employee need not show that the employer imposed intolerable conditions with the specific intent to force the employee to resign. *Boze,* 912 F.2d at 804; *Jurgens v. EEOC,* 903 F.2d 386, 390 (5th Cir.1990).

▮▮▮ An employee can recover under a constructive discharge theory based on a demotion if the working conditions in the new position were so intolerable that a reasonable employee would have resigned. *Boze,* 912 F.2d at 806. Although demotions may give rise to a constructive discharge, a "slight decrease in pay coupled with some loss of supervisory responsibilities is insufficient to constitute a constructive discharge." *Jurgens,* 903 F.2d at 391–92. When the humiliation and embarrassment of a demotion are not significant, there can be no claim of constructive discharge. *Id.* at 391.

▮▮▮ In this case, upon his demotion to on-car supervisor, David's working conditions were not so difficult or unpleasant that he had no choice but to resign. While his job title and duty station changed, his base salary was unaffected. Moreover, David adduces no evidence that after his demotion he was treated disrespectfully by management or that he was asked to perform duties that were demeaning or not required of other employees. David's assertion that UPS deliberately transferred him to a position with such intolerable working conditions is merely David's own conclusory allegation. Such assertions, unsupported by facts, are insufficient to defeat summary judgment. *Williams v. Weber Management Servs., Inc.,* 839 F.2d 1039, 1041 (5th Cir.1987); *see also Slaughter v. Allstate Ins. Co.,* 803 F.2d 857, 860–61 (5th Cir.1986); *Friedel v. City of Madison,* 832 F.2d 965, 972 (7th Cir.1987). There must be evidence giving rise to reasonable inferences that support the nonmoving party's position. *St. Amant v. Benoit,* 806 F.2d 1294, 1297 (5th Cir.1987). Mere allegations are insufficient. *Lodge Hall Mu-*

sic, Inc. v. Waco Wrangler Club, Inc., 831 F.2d 77, 79 (5th Cir.1987).

■ Because the Pattons have neither described any working conditions that would be considered intolerable by a reasonable person, nor have they demonstrated that David was reasonable in resigning from UPS, the Pattons have failed to show that David was constructively discharged by UPS.

### c. Disparate Treatment

■ The Pattons also claim that David was a victim of disparate treatment when compared to black employees. To establish a claim of disparate treatment under Title VII, David must show that UPS gave preferential treatment to a minority employee under "nearly identical" circumstances. See Little, 924 F.2d at 97; Smith v. Wal-Mart Stores, 891 F.2d 1177, 1180 (5th Cir. 1990); Davin v. Delta Air Lines, Inc., 678 F.2d 567, 570 (5th Cir. [Unit B] 1982); Switzer, 850 F.Supp. at 547.

The Pattons claim that black employees, specifically Brenda Fair ("Fair") and Reggie Charles ("Charles"), received preferential treatment. The Pattons contend that Fair was treated more favorably than David when she was demoted a second time from manager to safety supervisor. Fair stated at deposition that she had worked for UPS since 1974 and was promoted to center manager in 1989. In late 1989, Fair was demoted by Liana to supervisor because she failed to report two accidents in her center to the safety office. Liana again promoted Fair to center manager in 1992. In 1993, however, Fair was demoted after she improperly submitted a form for another employee. David complains in his response that he was not considered for the safety position that was given to Fair. The defendants point out, however, that this position did not exist until three weeks after David's demotion. As to Charles, the Pattons complain that he was promoted to a management position even though he was not qualified. Morrison testified at deposition that Charles was promoted in 1993 to "Stafford hub manager, night sort," although, in Morrison's opinion, he was not qualified due to his shortcomings in the areas of accountability and attention to detail.

The Pattons have failed to show that David's and Fair's demotions were "nearly identical." Rather, the demotions were for two completely different types of misconduct under factually distinct circumstances. There is no evidence that Fair refused to cooperate in an investigation or disobeyed a direct order of her supervisor. In addition, unlike Fair, David chose to resign rather than continuing to pursue other management positions at UPS. In any event, the fact remains that Fair, a black employee, was twice demoted. Further, the Pattons do not demonstrate the relevance of Charles' promotion. There is no evidence that he and David were similarly situated or that David and Charles were competing for the same position. Moreover, David is not complaining in this lawsuit of a failure to promote him, as he was initially promoted, and then, after his demotion, he did not remain at UPS long enough to be considered for another promotion. Accordingly, the Pattons have failed to meet their burden to prove a prima facie case of reverse race discrimination.

### d. UPS's Legitimate Nondiscriminatory Reason for David's Demotion

■ Furthermore, without regard to the fact that the Pattons have not established a prima facie case of race discrimination, UPS has articulated a legitimate, nondiscriminatory reason for David's demotion—his insubordinate behavior. Thus, the prima facie case is dissolved, and the burden shifts back to the plaintiffs to establish that the reason proffered by the employer is merely a pretext for discrimination. McDonnell Douglas Corp., 411 U.S. at 802, 93 S.Ct. at 1824; Rhodes, 39 F.3d at 542; Marcantel, 37 F.3d at 200; Moham, 3 F.3d at 875.

The Pattons contend in their response to the motion for summary judgment that the "baseball incident" was a pretext for demoting David. The Pattons claim that "[t]his lawsuit actually arose out of UPS's need or desire to promote black managers in its Southeast Texas District without adding so many new managers that the Southeast Texas District would appear 'top heavy', thereby reflecting poorly on defendants Clark, the Division Manager, and Liana, the District Manager, and Schultz, the District Human

Resources Manager." Although not presented in their response to the motion for summary judgment, the Pattons' First Amended Original Petition mentions five demoted white managers, including David, and five promoted black supervisors. David claimed at deposition that UPS promoted the five black supervisors in an effort to make the numbers look better in a report to the Office of Federal Contract Compliance. When asked what caused him to reach that conclusion, David responded, "Because subsequently five white managers in the same sequence were demoted for ridiculous reasons, just like mine. I was one of the five." David also asserted that he believed that these individuals were promoted to make the report look better because in the 1980s, he worked in personnel and had helped fill out the report before it became automated. Additionally, David claimed his belief was based on the fact that all the changes were announced at the same time. When asked if he was directly involved in any of the four white individuals' situations or with the facts surrounding their terminations or demotions, David responded that he was not.

The Pattons also argue in their response that the defendants' reason for the "witch-hunt" will not withstand scrutiny because the defendants continued to "persecute" David after Norstrom came forward and accepted responsibility, *i.e.,* the defendants knew that Norstrom had placed the ball in David's office before they actually reassigned David to a lower-level position. Thus, according to the Pattons, this shows that the baseball incident was merely a pretext for David's demotion.

David further stated at deposition that UPS's actions were arbitrary because a three-step disciplinary procedure was not utilized when demoting him. Yet, David could recall only one instance in which UPS had used a three-step procedure with a supervisor or manager. Furthermore, there is no evidence that a three-step procedure was the only method of discipline utilized at UPS or that it was the preferred method in cases of insubordination.

In his affidavit, Lazarte indicates that the five black employees to whom the Pattons refer in their First Amended Original Petition were promoted in three separate years

and none of them replaced David. In addition, Lazarte's affidavit reflects that in the same month in 1993 when two of the black supervisors were promoted, two white supervisors were also promoted to manager. Moreover, none of the witnesses deposed by the Pattons, *i.e.,* Liana, Schultz, Fair, or Morrison, stated that they were ever pressured to promote unqualified employees. The record is completely devoid of any evidence, besides David's own deposition testimony and conclusory allegations, of any alleged affirmative action plan by UPS, let alone showing that such a plan served to discriminate against David. As noted above, an employee's own subjective belief of race discrimination, however genuine, cannot serve as the basis for judicial relief. *Little,* 924 F.2d at 96; *Sherrod,* 785 F.2d at 1316; *Hornsby,* 777 F.2d at 246; *Elliott,* 714 F.2d at 567.

■ In summary, the Pattons' proffered summary judgment evidence consists exclusively of conclusory and speculative allegations of race discrimination, which are unsupported by specific facts. In the court's view, the evidence is insufficient to support a *prima facie* case of employment discrimination or refute UPS's legitimate nondiscriminatory reason for David's demotion. While the matter could have been handled differently, it is not the court's place to second-guess management's business decisions or to serve as a self-appointed, corporate personnel manager. *Waggoner,* 987 F.2d at 1165; *Bienkowski,* 851 F.2d at 1507–08. Furthermore, Title VII does not make an "employer liable for simply erroneous or arbitrary decisions." *Friedel,* 832 F.2d at 973.

■ Although summary judgment is often ill-suited for sorting out nebulous questions of motivation, that is not always the situation. *Honore v. Douglas,* 833 F.2d 565, 569 (5th Cir.1987). As the First Circuit stated in *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990):

Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.

*See also Waggoner,* 987 F.2d at 1164; *Elliott,* 714 F.2d at 566. Here, because the Pattons' racial discrimination claims rest solely on conclusory allegations, improbable inferences, and unsupported speculation, summary judgment is likewise appropriate in this case.

### 3. *Retaliation*

■■■■ Title VII prohibits employers from retaliating against an employee who opposes what he believes to be unlawful employment practices. 42 U.S.C. § 2000e–3(a); *see Wells v. Hutchinson,* 499 F.Supp. 174, 196 (E.D.Tex.1980). Retaliation under Title VII is an action taken by an employer against an employee because of the employee's opposition to perceived discriminatory practices. *De Anda v. St. Joseph Hosp.,* 671 F.2d 850, 852 n. 1 (5th Cir.1982). To establish a *prima facie* case of retaliation in violation of Title VII, the plaintiff must show: (1) that he participated in statutorily protected activity; (2) that an adverse employment action occurred; and (3) that a causal connection exists between the protected activity and the adverse action. *See Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086, 1092 (5th Cir. 1995); *Shirley v. Chrysler First, Inc.,* 970 F.2d 39, 42 (5th Cir.1992); *Jones v. Flagship Int'l,* 793 F.2d 714, 724 (5th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987); *Hamilton v. Rodgers,* 791 F.2d 439, 441–42 (5th Cir.1986). In order to maintain an action for retaliation, an employee need only establish that he had a reasonable belief that discriminatory practices existed. *De Anda,* 671 F.2d at 853 n. 2. In addition, the employee must show that his opposition to unlawful activity was a motivating or determining factor in his termination, *i.e.,* there must be a causal connection. *Jack v. Texaco Research Ctr.,* 743 F.2d 1129, 1131 (5th Cir.1984); *McMillan v. Rust College, Inc.,* 710 F.2d 1112, 1116 (5th Cir.1983). The plaintiff must show that he would not have been subjected to the adverse action "but for" the protected activity. *See Mayberry,* 55 F.3d at 1092; *Jack,* 743 F.2d at 1131.

■■■■ The defendants contend that no retaliation could have occurred because David did not file his EEOC charge until after he resigned. The defendants also argue that the Pattons abandoned their retaliation claim. At deposition, David was asked if he saw in ¶ 26 of the First Amended Original Petition that it states that defendants retaliated against the him. David responded as follows:

A Well, I think UPS retaliated against me, yes. I think this is—I wasn't working for UPS when the employment discrimination charges were made. So, I think that's a mistake. But, yes, they retaliated against me when I was working there. I think that whole—that whole Stafford baseball incident and its aftermath was retaliation. Wouldn't cooperate, whatever. They wanted to get rid of me, and they did.

Q Are you alleging that there is anything else you did, conduct you engaged in, of whatever nature, that you were being retaliated against for?

A There is nothing else I did. I wouldn't tell them the name of one person. That's the whole purpose.

Although in their response to the motion for summary judgment, the Pattons do not refute the defendants' allegation that David abandoned his claim for retaliation, the protection afforded by Title VII is not limited to individuals who have filed formal complaints of discrimination, but also extends to informal protests. *Graham v. Texasgulf, Inc.,* 662 F.Supp. 1451, 1462 (D.Conn.1987), *aff'd without opinion,* 842 F.2d 1287 (2d Cir.1988); *see generally Garcia v. Rush–Presbyterian–St. Luke's Medical Ctr.,* 80 F.R.D. 254, 261–62 (N.D.Ill.1978); *Wilson v. Willowbrook, Inc.,* 433 F.Supp. 321, 322 (N.D.Tex.1977), *cert. denied,* 439 U.S. 845, 99 S.Ct. 141, 58 L.Ed.2d 145 (1978).

■■■■ In ¶ 20 of their First Amended Original Petition, the Pattons allege that "[w]hen Plaintiff refused to divulge who had placed the baseball on the counter, he was retaliated against by being assigned to the only center that had no center manager and was forced to report to a supervisor *acting* as a center manager. In addition, he was forced to drive an additional sixty (60) miles daily through heavy traffic." Assuming, *arguendo,* that the Pattons have not abandoned their retaliation claim, they still have not

demonstrated that David engaged in any protected activity or "opposition" to unlawful employment practices, much less that UPS retaliated against him due to his participation. "[A]n employer cannot be guilty of retaliation for an employee's opposition to discrimination unless he is aware of that opposition." *Corley v. Jackson Police Dep't,* 639 F.2d 1296, 1300 (5th Cir. [Unit A] 1981). Moreover, an employee's statement cannot be deemed to be in opposition to an unlawful employment practice unless it refers to a specific practice of the employer that is allegedly unlawful. *EEOC v. Crown Zellerbach Corp.,* 720 F.2d 1008, 1013 (9th Cir.1983). Here, there is no evidence that David ever voiced any concerns about perceived discriminatory treatment while employed at UPS, either generally or specifically.

Thus, the Pattons have failed to establish a *prima facie* case of retaliation. Accordingly, the Pattons' retaliation claim lacks sufficient foundation to withstand summary judgment.

### 4. *Liability of Liana, Schultz, and Clark*

 Title VII imposes liability upon employers who violate its provisions. "Employer" is defined as "a person engaged in an industry affecting commerce ... and any agent of such a person." 42 U.S.C. § 2000e(b). In construing the term "any agent," courts have found immediate supervisors to be employers under the Act when they have been delegated an employer's traditional rights, such as hiring and firing. *Harvey v. Blake,* 913 F.2d 226, 227 (5th Cir.1990); *Hamilton,* 791 F.2d at 443. Only when the supervisor is acting in an official capacity, however, can he be deemed an "agent" of the employer. *Harvey,* 913 F.2d at 228. Therefore, any recovery against the agent must be in his official, not individual, capacity. *Id.* The purpose of the inclusion of the "agent" provision in § 2000e(b) was to incorporate *respondeat superior* principles into Title VII, not to impose individual liability on supervisory employees. *Grant v. Lone Star Co.,* 21 F.3d 649, 652 (5th Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 574, 130 L.Ed.2d 491 (1994); *Miller v. Maxwell's Int'l, Inc.,* 991 F.2d 583, 587 (9th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994). Therefore, finding an individual employee of a private corporation liable in his "official" capacity is tantamount to finding the corporation liable.

The Pattons correctly point out in their response that there is nothing in *Grant* to insulate Liana, Schultz, and Clark from individual liability for the Pattons' tort claims. The Pattons also contend, however, that Liana, Schultz, and Clark are individually liable for claims brought under the TCHRA and Title VII. The Pattons assert that Liana, Schultz, and Clark are "agents of UPS, and therefore employers under the plain language of the statute." Furthermore, the Pattons allege that because the summary judgment evidence "indisputably shows that Liana, Clark and Schultz had the power to demote or reassign David Patton, and Liana controlled David Patton's compensation ...", these individuals are employers under the statute and should be held individually liable for their Title VII violations." The Pattons further claim that "[a]ny authority purporting to disregard this plain statutory language is simply incorrect." The Pattons then cite a Tenth Circuit case that analyzes the Fifth Circuit's alleged departure from the statutory language. *See Ball v. Renner,* 54 F.3d 664, 667 (10th Cir.1995).

 This court, however, is bound by Fifth Circuit precedent. *Jett Racing & Sales, Inc. v. Transamerica Commercial Fin. Corp.,* 892 F.Supp. 161, 163 (S.D.Tex. 1995); *Cedillo v. Valcar Enters. & Darling Del. Co.,* 773 F.Supp. 932, 936 (N.D.Tex. 1991); *Peregoy v. Amoco Prod. Co.,* 742 F.Supp. 372, 375 (E.D.Tex.1990), *aff'd,* 929 F.2d 196 (5th Cir.), *cert. denied,* 502 U.S. 864, 112 S.Ct. 188, 116 L.Ed.2d 149 (1991). Here, there is ample Fifth Circuit authority on point, which this court must follow absent an intervening United States Supreme Court or *en banc* Fifth Circuit decision to the contrary. *See Jones v. Coughlin,* 45 F.3d 677, 679 (2d Cir.1995); *Coca–Cola Bottling Co. v. Coca–Cola Co.,* 988 F.2d 386, 411 n. 25 (3d Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 289, 126 L.Ed.2d 239 (1993). Accordingly, the Pattons' reference to other circuits in this regard is unpersuasive. Under established Fifth Circuit precedent, individual employees, even those functioning in a management capacity, such as Liana, Schultz, and Clark,

cannot be held personally liable under Title VII. *Grant*, 21 F.3d at 652–53. Similarly, under Texas precedent, they cannot be held personally liable under the TCHRA, as the Act does not create a cause of action against supervisors or individual employees. *See Thompson v. City of Arlington*, 838 F.Supp. 1137, 1153 (N.D.Tex.1993); *City of Austin v. Gifford*, 824 S.W.2d 735, 742 (Tex.App.—Austin 1992, no writ). Therefore, the Pattons' claims based on Title VII and the TCHRA against Liana, Schultz, and Clark, individually, must be dismissed.

### 5. *Claims under the TCHRA*

One purpose of the TCHRA is to "provide for the execution of the policies of Title VII." Tex.Lab.Code Ann. § 21.001; *Thompson*, 838 F.Supp. at 1153; *Elstner v. Southwestern Bell Tel. Co.*, 659 F.Supp. 1328, 1345 (S.D.Tex.1987), *aff'd without opinion*, 863 F.2d 881 (5th Cir.1988); *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 485 (Tex.1991). Therefore, consistent with the TCHRA's general policy, it is interpreted in a manner consistent with Title VII. *Elstner*, 659 F.Supp. at 1345; *see Farrington v. Sysco Food Servs., Inc.*, 865 S.W.2d 247, 251 (Tex. App.—Houston [1st Dist.] 1993, writ denied); *Gifford*, 824 S.W.2d at 739. Accordingly, this court will construe all claims under the TCHRA consistent with similar claims under Title VII. Therefore, to the extent that summary judgment is appropriate with respect to the Pattons' claims under Title VII, it is also appropriate as to their parallel claims under the TCHRA.

### 6. *State Law Claims*

#### a. *Intentional Infliction of Emotional Distress*

To prevail on their claim of intentional infliction of emotional distress, the Pattons must establish: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused them emotional distress; and (4) the emotional distress suffered by them was severe. *MacArthur v. University of Tex. Health Ctr.*, 45 F.3d 890, 898 (5th Cir.1995); *McKethan*, 996 F.2d at 742; *Ugalde*, 990 F.2d at 243; *Ramirez v. Allright Parking El Paso, Inc.*, 970 F.2d 1372, 1375 (5th Cir.1992); *Johnson v. Merrell*

*Dow Pharmaceuticals, Inc.*, 965 F.2d 31, 33 (5th Cir.1992); *Dean v. Ford Motor Credit Co.*, 885 F.2d 300, 306 (5th Cir.1989); *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995) (citing *Twyman v. Twyman*, 855 S.W.2d 619, 621–22 (Tex. 1993)); *Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex.1993).

While "extreme and outrageous," as used in the second element of this standard, is an amorphous phrase that escapes precise definition, there appears to be a consensus that conduct is "outrageous" if it is "atrocious" and surpasses "all possible bounds of decency," such that it is "utterly intolerable in a civilized community." *See MacArthur*, 45 F.3d at 898; *Ugalde*, 990 F.2d at 243; *Johnson*, 965 F.2d at 33; *Dean*, 885 F.2d at 306; *Randall's Food Mkts., Inc.*, 891 S.W.2d at 644; *Wornick*, 856 S.W.2d at 734. In *Dean*, the Fifth Circuit (citing Restatement (Second) of Torts § 46, comment d (1965)) stated:

> Liability [for outrageous conduct] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.... Generally, the case is one in which a recitation of the facts to an average member of the community would lead him to exclaim, "Outrageous."

885 F.2d at 306. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *Ugalde*, 990 F.2d at 243; *Johnson*, 965 F.2d at 33; *Wilson v. Monarch Paper Co.*, 939 F.2d 1138, 1143 (5th Cir.1991). There is no occasion for the law to intervene in every case where someone's feelings are hurt. *Id.*

Specifically, in the employment context, the Fifth Circuit, applying Texas law, has repeatedly stated that a claim for intentional infliction of emotional distress will not lie for "mere employment disputes." *MacArthur*, 45 F.3d at 898; *Johnson*, 965 F.2d at 33. The courts recognize that in order to manage its business properly, an employer must be able to supervise, review, criticize, demote, transfer, and discipline employees. *Id.* at 34; *Wilson*, 939 F.2d at 1143. Even

actions that may be illegal in an employment setting may not be the sort of behavior that constitutes "extreme and outrageous" conduct for purposes of an intentional infliction of emotional distress claim. *Ugalde,* 990 F.2d at 243; *see Sebesta v. Kent Elecs. Corp.,* 886 S.W.2d 459, 462–63 (Tex.App.—Houston [1st Dist.] 1994, writ denied).

In this case, by incorporating allegations previously asserted in the fact section of their petition, the Pattons assert in ¶ 27 that the "Defendants intentionally inflicted emotional distress upon Plaintiff Patton." The previous paragraphs describe the "baseball incident." During this time period, several UPS representatives asked David to explain how he came into possession of the baseball. David alleged at deposition that he was put through a "kangaroo court" and "basically just put me to run the gauntlet" when he refused to explain who placed the baseball in his office. David also complained that when he returned to work on Monday morning, August 9, 1993, "they made me sit in a conference room for about two hours" before being able to meet with his supervisors. He described the objectionable conduct as including "hollering," insults, "smart-alecky" allusions to "not being man enough" or somehow being "dirty," as well as a "derogatory, sarcastic attitude" displayed by his superiors.

In their motion for summary judgment, the defendants address the third element of a claim for intentional infliction of emotional distress, asserting that their conduct during the "baseball incident" was not "extreme and outrageous" under Texas law. In response, the Pattons argue:

> Since the defendants (sic) summary judgment evidence is largely inadmissible, and since the remaining evidence indicates beyond a doubt that the defendants hounded, persecuted, and harassed David Patton for (i) information and (ii) a 99–cent baseball, even after the defendants already had both of them, it is difficult to see how a reasonable jury could describe the defendants' conduct as anything other than "extreme and outrageous." At the very least, this is a question best left to a jury.

■■■ Clearly, the conduct alleged by the Pattons is far less egregious than other actions found not to constitute intentional infliction of emotional distress as a matter of law in a number of cases. *See, e.g., Ramirez,* 970 F.2d at 1376–77; *Johnson,* 965 F.2d at 34; *Guthrie v. Tifco Indus.,* 941 F.2d 374, 379 (5th Cir.1991), *cert. denied,* 503 U.S. 908, 112 S.Ct. 1267, 117 L.Ed.2d 495 (1992); *Clayton v. Nabisco Brands, Inc.,* 804 F.Supp. 882, 888 (S.D.Tex.1992); *Horton v. Montgomery Ward & Co.,* 827 S.W.2d 361, 369 (Tex. App.—San Antonio 1992, writ denied). Only in the most unusual of situations does conduct move out of the "realm of an ordinary employment dispute," into the classification of "extreme and outrageous," as required for the tort of intentional infliction of emotional distress. *Prunty v. Arkansas Freightways, Inc.,* 16 F.3d 649, 654 (5th Cir.1994) (quoting *Dean,* 885 F.2d at 307). Here, the Pattons do not allege that David was accused of criminal conduct, physically assaulted, restrained, or even subjected to profane language in the course of the "baseball incident." The Fifth Circuit has held that, under Texas law, informing the police that someone is engaged in an activity such as being intoxicated or using drugs "is not sufficiently outrageous conduct to warrant the recovery of damages for the intentional infliction of emotional distress even if those statements are false." *Halbert v. City of Sherman,* 33 F.3d 526, 529 (5th Cir.1994). Hence, in this case, the challenged behavior does not even approach the level of "extreme and outrageous" conduct required to support a recovery for intentional infliction of emotional distress under Texas law.

■■■ Furthermore, the Pattons have made no showing that any emotional distress David suffered was severe. A claim of intentional infliction of emotional distress requires that there be "sufficient proof of severe emotional distress, wholly apart from any outrageous conduct on the defendant's part." *Tidelands Auto. Club v. Walters,* 699 S.W.2d 939, 944 (Tex.App.—Beaumont 1985, writ ref'd n.r.e.); *see also Badgett v. Northwestern Resources Co.,* 818 F.Supp. 998, 1003 (W.D.Tex.1993). The severity of distress is an element of the cause of action, not merely a matter of damages. *Benavides v. Moore,* 848 S.W.2d 190, 195 (Tex.App.—Corpus Christi 1992, writ denied); *K.B. v. N.B.,* 811 S.W.2d 634, 640 (Tex.App.—San Antonio

1991, writ denied), *cert. denied,* 504 U.S. 918, 112 S.Ct. 1963, 118 L.Ed.2d 564 (1992).

"Emotional distress" means any highly unpleasant mental reaction such as extreme grief, shame, humiliation, embarrassment, anger, disappointment, worry, and nausea. *Behringer v. Behringer,* 884 S.W.2d 839, 844 (Tex.App.—Fort Worth 1994, writ denied); *see also Washington v. Knight,* 887 S.W.2d 211, 216 (Tex.App.—Texarkana 1994, writ denied); *Badgett,* 818 F.Supp. at 1003; *Tidelands Auto. Club,* 699 S.W.2d at 945. In order to recover damages, however, the plaintiff must prove more than mere worry, anxiety, vexation, embarrassment, or anger. *Regan v. Lee,* 879 S.W.2d 133, 136 (Tex. App.—Houston [14th Dist.] 1994, no writ); *Haryanto v. Saeed,* 860 S.W.2d 913, 923 (Tex. App.—Houston [14th Dist] 1993, writ denied). "The law intervenes only where the distress is so severe that no reasonable person should be expected to endure it." *Behringer,* 884 S.W.2d at 844 (citing Restatement (Second) of Torts § 46, comment j).

The Pattons assert in ¶ 20 that "[d]ue to his employer's intentional harsh, oppressive, harassing and malicious conduct, Plaintiff was caused to suffer emotional distress causing him to have headaches, insomnia and nausea. Plaintiff became physically exhausted and lost much of his motivation." David does not claim to have experienced any psychiatric problems, like those encountered by the plaintiff in *Johnson,* or even debilitating headaches, such as those suffered by the plaintiff in *Clayton,* stemming from the defendant's actions. *See Johnson,* 965 F.2d at 33; *Clayton,* 804 F.Supp at 885. David certainly does not claim to be suffering from anything approaching the possibly suicidal, reactive depression experienced by the plaintiff in *Wilson. See Wilson,* 939 F.2d at 1141; *see also Motsenbocker v. Potts,* 863 S.W.2d 126, 135 (Tex.App.—Dallas 1993, no writ); *American Medical Int'l, Inc. v. Giurintano,* 821 S.W.2d 331, 343 (Tex.App.—Houston [14th Dist.] 1991, no writ). David also has not alleged that he suffers from post-traumatic stress syndrome as diagnosed in *Haryanto. See Haryanto,* 860 S.W.2d at 922. Hence, David's claimed emotional distress cannot be said to be "so severe that no reasonable [person] could be expected to en-

dure it." *K.B.,* 811 S.W.2d at 640; *Benavides,* 848 S.W.2d at 195.

Therefore, because the Pattons have failed to adduce sufficient evidence to support two of the required elements of an intentional infliction of emotional distress claim under Texas law—extreme and outrageous conduct and severe emotional distress—summary judgment on this claim is proper.

### b. *Defamation*

The Pattons also assert that the defendants slandered and defamed David. Slander is a defamatory statement published orally to a third person without legal excuse. *Halbert,* 33 F.3d at 530; *Randall's Food Mkts., Inc.,* 891 S.W.2d at 646. Libel is a written defamatory statement which tends to injure the plaintiff's reputation, thus exposing him to "public hatred, contempt, ridicule, or financial injury, or impeach his honesty, integrity, virtue or reputation." *Halbert,* 33 F.3d at 530 (quoting *Sellards v. Express–News Corp.,* 702 S.W.2d 677, 679 (Tex.App.—San Antonio 1985, writ ref'd)); *Hill v. Herald–Post Publishing Co.,* 877 S.W.2d 774, 778 (Tex.App.—El Paso 1994), *aff'd in part and rev'd in part on other grounds,* 891 S.W.2d 638 (Tex.1994). "A statement may be false, abusive, and unpleasant without being defamatory." *Free v. American Home Assurance Co.,* 902 S.W.2d 51, 54 (Tex.App.—Houston [1st Dist.] 1995, n.w.h.). In addition, a plaintiff's opinion of the statements has no bearing on whether they were defamatory. *Farias v. Bexar County Bd. of Trustees for Mental Health Mental Retardation Servs.,* 925 F.2d 866, 878 (5th Cir.), *cert. denied,* 502 U.S. 866, 112 S.Ct. 193, 116 L.Ed.2d 153 (1991). It is a question of law for the court to determine whether words are reasonably capable of a defamatory meaning. *Id.*

In order to recover for defamation, the plaintiff must show that the publisher knew or should have known the defamatory statement was false. *Foster v. Laredo Newspapers, Inc.,* 541 S.W.2d 809, 819 (Tex. 1976), *cert. denied,* 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977); *Houston Chronicle Publishing Co. v. Stewart,* 668 S.W.2d 727, 729 (Tex.App.—Houston [1st Dist.] 1983, writ dism'd w.o.j.). In suits

brought by private individuals, truth is an affirmative defense. *Randall's Food Mkts., Inc.*, 891 S.W.2d at 646; *see also Farias*, 925 F.2d at 878. A showing of substantial truth will defeat the plaintiff's cause of action. *See, e.g., McIlvain v. Jacobs*, 794 S.W.2d 14, 15 (Tex.1990). In addition, a defamatory statement may be protected by a qualified privilege. "A qualified privilege protects statements made in good faith on a subject matter in which the author has an interest or with reference to which he has a duty to perform to another person having a corresponding interest or duty." *Halbert*, 33 F.3d at 530; *see also Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir.1995); *Danawala v. Houston Lighting & Power Co.*, 14 F.3d 251, 255 (5th Cir.1993); *Free*, 902 S.W.2d at 55; *Bergman v. Oshman's Sporting Goods, Inc.*, 594 S.W.2d 814, 816 (Tex. Civ.App.—Tyler 1980, no writ). This privilege is "based on a public policy that recognizes the need for the free communication of information to protect business and personal interests. To encourage open communication, it is necessary to afford protection from liability for misinformation given in an appropriate effort to protect or advance the interests involved." *Danawala*, 14 F.3d at 254 (quoting *Gaines v. CUNA Mutual Ins. Soc'y*, 681 F.2d 982, 986 (5th Cir.1982)). Such statements, however, must be made in good faith and without malice; otherwise, the privilege is lost. *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 768 (Tex.1987); *Schauer v. Memorial Care Sys.*, 856 S.W.2d 437, 449 (Tex.App.—Houston [1st Dist.] 1993, no writ); *Zarate v. Cortinas*, 553 S.W.2d 652, 655 (Tex.Civ.App.—Corpus Christi 1977, no writ). "In the defamation context, a statement is made with actual malice when the statement is made with knowledge of its falsity or with reckless disregard as to its truth." *Randall's Food Mkts., Inc.*, 891 S.W.2d at 646; *see also Carr v. Brasher*, 776 S.W.2d 567, 571 (Tex.1989); *Schauer*, 856 S.W.2d at 449. "This is a higher standard than common law malice; only clear and convincing proof will support recovery." *Duffy*, 44 F.3d at 313.

The Pattons claim in ¶ 17 of their First Amended Original Petition that "[s]uch disparate treatment and outrageous conduct [by the defendants] infringed on his [David's]

right of free speech and resulted in slander about him and the wrongful defamation of his character." More specifically, the Pattons allege that "[h]is friends at United Parcel Service told him they had heard that Loss Prevention (security department) had found a baseball in his desk." Although the Pattons contend this was not accurate, "once the rumor was started, he was treated like an outcast." In addition, David testified at his deposition that "[e]verybody told me the same thing that I talked to, said, 'Oh, I heard you got a baseball found in your desk, that you stole a baseball.'" David surmised in his deposition that this version of events was circulating due to Mike Kelly's ("Kelly") writeup of the incident. In addition, David declared that he was defamed when Clark told him that he had "sold out" his fellow employees and that "they were just talking about it up in the office." David also claimed that "[b]y creating the entire situation as they have, it has affected my ability to go on and seek employment elsewhere. People want to know why an 18-year employee would leave UPS." Moreover, although not mentioned in their response, the Pattons attach the affidavit of David Tarnosky ("Tarnosky"), a former employee of UPS. Tarnosky states that he had a conversation with his boss, Rick Carber ("Carber") who told him that loss prevention had found a baseball in David's desk. Tarnosky concedes that although Carber "did *not* say David Patton stole the baseball, he did say that the missing trinkets from a pallet by Automotive were found in his desk. His tone and his mannerisms led me to believe that he certainly was implying David's guilt in the incident." Tarnosky further states that Carber told him that he thought it was a "stupid career move by Patton ... all for a baseball." According to Tarnosky, this also made him think that David had taken the baseball. Tarnosky claimed Carber's tone was "sarcastic and demeaning in nature." The affidavit, however, does not indicate that these statements were made by the defendants and articulates no basis for concluding that the defendants authorized or ratified them.

The defendants assert in their motion for summary judgment that the Pattons' defamation claim should fail as a matter of law

because none of the alleged communications is defamatory. In the alternative, the defendants claim that even if the remarks were defamatory, they are protected by a qualified privilege. Furthermore, the defendants argue that the Pattons do not attribute any defamatory statements to Liana or Schultz; therefore, summary judgment is mandated as to them. Finally, the defendants contend that Patton has not told any prospective employer about the "baseball incident" when explaining why he left UPS.

■■■■■ Although Patton alleges that friends at UPS have told him that they had heard that Loss Prevention had found a baseball in his desk, hearsay is inadmissible to support the Pattons' slander claim. *Wells v. Shop Rite Foods, Inc.*, 474 F.2d 838, 839 (5th Cir.1973). Furthermore, unauthorized gossip spread by unidentified coworkers does not take the defendants outside the scope of a qualified privilege. *Danawala*, 14 F.3d at 255. Even taking the hearsay remarks into consideration, as well as Tarnosky's affidavit, statements that a baseball or other trinkets were found in David's desk do not have a defamatory meaning *per se.* Moreover, David admitted at his deposition that "[n]one of my friends ever accused me in words, 'hey, you stole the baseball,' no." When asked if anyone at UPS had said that, David responded, "[i]t was said every day." David was then asked who had said it. David answered that "[i]n their actions and their tone of voice, I just told you—." When directed to answer the question asked, David acknowledged that he had never heard anyone say that at UPS. "An innuendo may be used to explain, but not to extend, the effect and meaning of the language charged as libelous." *Schauer*, 856 S.W.2d at 448. "The test is what construction would be placed upon such language by the average reasonable person or the general public, not by the plaintiff." *Id.* Here, the average person can draw no conclusion as to how or why the baseball or other trinkets made their way to David's desk. Thus, in their usual meaning, these statements are not capable of a defamatory interpretation. *See id.*

■■■■ The next item that David asserts as defamatory, the writeup by Kelly, is not libelous. The memorandum, dated September 22, 1993, states in pertinent part:

They [loss prevention] searched the center offices and discovered an open medium sized package in the River Oaks Center office. There was a baseball inside the package. Claude informed me of this. I questioned Dave on why the package was in his office. He responded by saying a partner gave it to him. I asked who this partner was and Dave said he could not turn on his partner and would not tell me. I told Dave that he was putting his job on the line over a one dollar baseball and that he was not using good judgment. Dave still refused to tell me. Dave said it was the principle of the matter.

The memorandum does not accuse David of anything, much less stealing. Rather, the memorandum reports the fact that a baseball was found in the River Oaks Center office and relates the conversation between Kelly and David. It is inconceivable how this memorandum could injure David's reputation. Furthermore, as noted by the defendants, Kelly's memorandum is substantially true. Loss prevention did discover a baseball in the River Oaks Center office, as David handed it over to McGee from his office doorway. Moreover, as subsequent events confirmed, David was in fact putting his job on the line for a one dollar baseball, which could be deemed a lack of good judgment. As noted above, in suits brought by private individuals, truth is an affirmative defense. *Randall's Food Mkts., Inc.*, 891 S.W.2d at 646; *see also Farias*, 925 F.2d at 878. A showing of substantial truth will defeat the plaintiff's cause of action. *See, e.g., McIlvain*, 794 S.W.2d at 15.

■■■■ Similarly, David's allegation that Clark told him that he had "sold out" his coworkers does not constitute slander. As defined, slander is a defamatory statement published orally to a third person without legal excuse. *Halbert*, 33 F.3d at 530; *Randall's Food Mkts., Inc.*, 891 S.W.2d at 646. Here, there is no alleged publication to a third party. "One who communicates defamatory matter directly to the defamed person, who himself communicates it to a third party, has not published the matter to a third party if there are no other circumstances." *Doe v. SmithKline Beecham Corp.*, 855 S.W.2d 248, 259 (Tex.App.—Austin 1993),

*aff'd as modified on other grounds,* 903 S.W.2d 347 (Tex.1995).

David's claim that "[b]y creating the entire situation as they have, it has affected my ability to go on and seek employment elsewhere" suggests that he was forced to make defamatory comments about himself to prospective employers. The Texas Supreme Court, however, has not adopted the view that publication may occur by "self-defamation." *Id.* Furthermore, when asked at deposition what reason he gave to prospective employers when questioned about his reason for leaving UPS, David answered, "I wanted to change careers, that I wasn't going anywhere, that I was in a dead-end job. That's the only reason I can give." David was next asked if he had ever explained anything more or different than that to a potential employer, and he responded, "No." Additionally, the Pattons have presented no evidence that the defendants have directly or indirectly made defamatory statements about him to persons outside of the company.

 Even if the court were to consider the statements about which David complains to be defamatory, they are subject to a qualified privilege. The statements were privileged because they were made to fellow employees who had a corresponding interest in the subject matter—the efficient operation of the business and the whereabouts of company property. *See Halbert,* 33 F.3d at 530; *see also Duffy,* 44 F.3d at 312; *Danawala,* 14 F.3d at 255; *Free,* 902 S.W.2d at 55; *Bergman,* 594 S.W.2d at 816. "In addition, an employer has a conditional or qualified privilege that attaches to communications made in the course of an investigation following a report of employee wrongdoing." *Randall's Food Mkts., Inc.,* 891 S.W.2d at 646. Such statements, however, must be made in good faith and without malice; otherwise, the privilege is lost. *Hurlbut,* 749 S.W.2d at 768; *Schauer,* 856 S.W.2d at 449; *Zarate,* 553 S.W.2d at 655. In federal court, unlike in state court, the plaintiff must show malice, rather than the defendant establish absence of malice, to defeat summary judgment. *Duffy,* 44 F.3d at 314. Here, the Pattons made no effort to establish malice. *See Randall's Food Mkts., Inc.,* 891 S.W.2d at 646; *Carr,* 776 S.W.2d at 571; *Schauer,* 856 S.W.2d at 449.

 In response to the defendants' motion for summary judgment on this claim, as well as the invasion of privacy claim, the Pattons merely state that "[r]ather than engage in a lengthy rebuttal to each fruitless attack, it is sufficient for the Pattons to point out that David Patton's reputation has been damaged by the defendant's wrongful conduct, which necessarily invaded his privacy." Contrary to the Pattons' notion, however, these conclusory statements are insufficient as a matter of law to preserve their defamation claim.

#### c. Invasion of Privacy

 Texas law recognizes the common law right to privacy. *Farrington,* 865 S.W.2d at 253. The tort of invasion of privacy consists of four separate causes of action. *See Billings v. Atkinson,* 489 S.W.2d 858, 859 (Tex.1973). Professor Prosser catalogued the four distinct injuries under the tort of invasion of privacy, and a variation of these was adopted by the Second Restatement of Torts: (1) unreasonable intrusion upon seclusion; (2) appropriation of name or likeness; (3) unreasonable public disclosure of private facts; and (4) publicity placing a person in a false light. *See* Restatement (Second) of Torts § 652A–E (1977); William L. Prosser, Handbook of the Law of Torts 638 (2d ed. 1955).

 Texas does not recognize the tort of false light invasion of privacy. *Johnson v. Sawyer,* 47 F.3d 716, 732 n. 34 (5th Cir.1995) (citing *Cain v. Hearst Corp.,* 878 S.W.2d 577, 578–79 (Tex.1994)). In addition, although well established in the jurisprudence of many states, the Texas Supreme Court has not addressed invasion of privacy by appropriation of name or likeness. *Cain,* 878 S.W.2d at 578 n. 2. In any event, the Pattons have not asserted that the defendants have used David's name or likeness "to advertise the defendant's product or to enhance the sale of an article" or that they have commercialized, exploited, or capitalized upon David's name or reputation. *See Kimbrough v. Coca–Cola/USA,* 521 S.W.2d 719, 721 (Tex.Civ.App.—Eastland 1975, writ ref'd n.r.e.).

 Texas courts have recognized the other two types of invasion of privacy torts.

To establish a claim for unreasonable intrusion upon seclusion, the plaintiff must establish: "(1) an intentional intrusion; (2) upon the seclusion, solitude, or private affairs of another; (3) which would be highly offensive to a reasonable person." *Farrington,* 865 S.W.2d at 253 (citing *Gill v. Snow,* 644 S.W.2d 222, 223–24 (Tex.App.—Fort Worth 1982, no writ); Restatement (Second) of Torts § 652B (1977)). Courts have also required the intrusion to be unreasonable, unjustified, or unwarranted. *Id.* (citing *Billings,* 489 S.W.2d at 860; *K–Mart Corp. v. Trotti,* 677 S.W.2d 632, 636 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.)). The tort of public disclosure of embarrassing private facts requires the plaintiff to prove: "(1) that the publicized information 'contains highly intimate or embarrassing facts about a person's private affairs, such that its publication would be highly objectionable to a person of ordinary sensibilities,' (2) that such information was 'communicated to the public at large,' not simply to 'a small group of persons,' and (3) 'that the information publicized not be of legitimate concern to the public.'" *Sawyer,* 47 F.3d at 731 (quoting *Industrial Found. of the South v. Texas Indus. Accident Bd.,* 540 S.W.2d 668, 683–85 (Tex.1976) (citations omitted)).

The Pattons claim in ¶ 18 of their First Amended Original Petition that "[a]n invasion of his [David's] privacy was demonstrated when United Parcel Service, Inc., through its agents, servants and/or employees, demanded that he divulge personal information that he had no responsibility or obligation to offer." David was asked at deposition how he believed his privacy was invaded, and he responded as follows:

> UPS, through this entire ordeal, has made the inference that they owned me, that's—they didn't have any—they're not entitled to that information. It doesn't affect them. There was no loss of UPS property. It was a non-factor.

In addition, David was asked if there was anything else about the situation that he believed was an invasion of his privacy, and David answered:

> Well, it destroyed my life. I mean, attempted to. But as it says here, demanded that I divulge personal information that I had no responsibility or obligation to

offer. It wasn't my stuff that I needed to tell about. And they indicated that it was my responsibility, and it was not my responsibility. In 18 years I never had any, so much as a admonition from anybody from United Parcel Service that I didn't fulfill my responsibility.

After subsequent questioning, David responded that he was not aware of anything else that constituted an invasion of privacy other than what he had mentioned.

■ Although the Pattons allege that the defendants demanded that he divulge personal information that he had no responsibility or obligation to offer, the matter about which the defendants questioned David involved UPS property. The questioning occurred during business hours and on business premises. This hardly can be classified as an intrusion upon the seclusion, solitude, or private affairs of David or as being highly offensive to a reasonable person. *See Farrington,* 865 S.W.2d at 253. Moreover, the questioning by the defendants was not unreasonable, unjustified, or unwarranted, as he was merely asked to disclose the identity of the person who had given him the baseball, a UPS promotional item. *See id.; K–Mart,* 677 S.W.2d at 636; *Billings,* 489 S.W.2d at 860. This was not David's private affair, but was instead UPS's affair. Indeed, it was David, not the defendants, who acted unreasonably by refusing to respond to a legitimate inquiry by management, especially after he was assured that no harm would befall the person in question. Thus, the Pattons have not established a claim for unreasonable intrusion upon David's seclusion or private affairs.

■ The Pattons have also failed to demonstrate the public disclosure of embarrassing private facts. The Pattons do not claim that the defendants publicized embarrassing private facts about David to anyone, much less to the public at large. *See Sawyer,* 47 F.3d at 731; *Industrial Found. of the South,* 540 S.W.2d at 683–84. Obviously, Norstrom, who actually gave the baseball to David, did not find the facts too embarrassing to reveal to management. If anyone reasonably could have been embarrassed by this incident, it was Norstrom, not David. Therefore, the Pattons have not met their burden of estab-

lishing a claim for public disclosure of embarrassing private facts.

Hence, as to the Pattons' invasion of privacy claim, summary judgment is warranted.

### d. *Wrongful Discharge*

The Pattons assert in their response to the motion for summary judgment that a claim for wrongful termination is stated in ¶ 24 of the First Amended Original Petition. Paragraph 24 is located under the section of the petition entitled "Facts Relative to All Causes of Action." In ¶ 24, the Pattons allege that "[o]n October 1, 1993, he [David] was constructively fired and wrongfully terminated." There is no mention of a wrongful termination claim, however, in the statement of claims.

In any event, Texas courts have long recognized that in an employment setting, absent a specific contract term, statutory prohibition, or public policy consideration to the contrary, employment relationships are terminable at will by either party. *See Moulton v. City of Beaumont*, 991 F.2d 227, 230 (5th Cir.1993); *Federal Express Corp. v. Dutschmann*, 846 S.W.2d 282, 283 (Tex.1993) (per curiam); *Schroeder*, 813 S.W.2d at 489; *Winters v. Houston Chronicle Publishing Co.*, 795 S.W.2d 723, 723–24 (Tex.1990); *East Line & R. R.R. Co. v. Scott*, 72 Tex. 70, 10 S.W. 99, 102 (1888); *Hicks v. Baylor Univ. Med. Ctr.*, 789 S.W.2d 299, 301 (Tex.App.—Dallas 1990, writ denied); *Lumpkin v. H & C Communications, Inc.*, 755 S.W.2d 538, 539 (Tex.App.—Houston [1st Dist.] 1988, writ denied).

▊ Thus, "[t]o establish a cause of action for wrongful discharge, an employee must prove that he and his employer entered into a contract that specifically provided that the employer did not have the right to terminate the employment at will." *Farrington*, 865 S.W.2d at 252. The Pattons have not produced any evidence of this nature. Furthermore, the Pattons have not submitted evidence that David was discharged for failure to perform an illegal act, which would place him within a narrow exception to the employment at will doctrine. *See id.* at 253 (citing *Sabine Pilot Serv., Inc. v. Hauck*, 687 S.W.2d 733, 735 (Tex.1985)). Accordingly, there is no evidence in the record that would support a claim for wrongful discharge under Texas law.

Thus, summary judgment on this claim is proper.

### e. *Breach of the Duty of Good Faith and Fair Dealing*

The Pattons also argue in their response that they have alleged a claim for breach of the duty of good faith and fair dealing in ¶ 21 of their First Amended Original Petition. Paragraph 21 is located under the section of the petition styled "Facts Relative to All Causes of Action." In ¶ 21, the Pattons allege that UPS acted "irresponsibly in their dealings with Plaintiff." The Pattons complain that David, an "eighteen-year employee with an excellent work record and no negative evaluations" should not have been placed in an entry level supervisory position. The Pattons further complain about the fact that a safety supervisor position was created three weeks later for another employee who was demoted. According to the Pattons, "[s]uch conduct on the part of Defendant, United Parcel Services, Inc., through its agents, servants and/or employees was a breach of duty of good faith and fair dealing." There is no mention, however, of a cause of action for breach of the duty of good faith and fair dealing in the Pattons' statement of claims.

▊ Whether the Pattons have adequately raised this as a cause of action is not determinative. As the defendants correctly point out in their reply brief, Texas courts have refused to imply a duty of good faith and fair dealing in the employment context. *Pruitt v. Levi Strauss & Co.*, 932 F.2d 458, 462 (5th Cir.1991); *Doe*, 855 S.W.2d at 260; *Winograd v. Willis*, 789 S.W.2d 307, 312 (Tex.App.—Houston [14th Dist.] 1990, writ denied). The Texas Supreme Court has noted that the tort of breach of the duty of good faith and fair dealing has been found only in certain "special relationships," and has expressly "declined to recognize a general duty of good faith and fair dealing in the employer-employee relationship." *Federal Express Corp.*, 846 S.W.2d at 284 n. 1.

Hence, summary judgment is appropriate as to this claim.

**1278**

### B. *Vera Patton's Claims*

#### 1. *The Standard for Dismissal under Rule 12(b)(6)*

A motion to dismiss under Fed. R.Civ.P. 12(b)(6) tests only the formal sufficiency of the statements of the claims for relief. It is not a procedure for resolving contests about the facts or the merits of the case. In ruling on a motion to dismiss, the court must take the plaintiff's allegations as true, view them in a light most favorable to her, and draw all inferences in her favor. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *see also Capital Parks, Inc. v. Southeastern Advertising & Sales Sys., Inc.,* 30 F.3d 627, 629 (5th Cir.1994); *Fernandez–Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284–85 (5th Cir. 1993). Moreover, the court may not look beyond the four corners of the plaintiff's pleadings. *McCartney v. First City Bank,* 970 F.2d 45, 47 (5th Cir.1992). Thus, the motion must be denied unless it appears to a certainty that the plaintiff can prove no set of facts in support of her claim that would entitle her to relief. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Blackburn v. City of Marshall,* 42 F.3d 925, 931 (5th Cir.1995); *In re U.S. Abatement Corp.,* 39 F.3d 556, 559 (5th Cir.1994); *ALX El Dorado, Inc. v. Southwest Sav. & Loan Ass'n,* 36 F.3d 409, 410 (5th Cir.1994); *McCartney,* 970 F.2d at 47.

#### 2. *Title VII and TCHRA Claims*

[99, 100] "Title VII actions against employers for discriminatory employment practices may be brought by any 'person claiming to be aggrieved.'" *Feng v. Sandrik,* 636 F.Supp. 77, 82 (N.D.Ill.1986) (quoting 42 U.S.C. § 2000e–5(f)(1)). The phrase "persons aggrieved" generally encompasses employees or applicants for employment with the allegedly offending employer. *Id.; see also* 42 U.S.C. § 2000e(f) (definition of employee); Tex.Lab.Code Ann. § 21.002(5) (definition of employee). "To have standing as a person aggrieved under Title VII the plaintiff must show that (1) he has actually suffered an injury and (2) that the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Feng,* 636 F.Supp. at 82 (citations omitted).

[101] In the instant case, the First Amended Original Petition states, "COMES NOW, DAVID J. PATTON, and wife, VERA PATTON Plaintiffs in the above-styled cause. . . ." Beyond this statement, the Pattons' petition is devoid of any allegations regarding Vera or her involvement in the events precipitating this lawsuit. Furthermore, nowhere does Vera allege that she was ever employed by UPS or that she ever sought or even desired employment at UPS. Her only connection with this case is the fact that she is married to David. "However, spouses of individuals who have been victimized by employment discrimination cannot be said to fall within the class of persons Title VII [or TCHRA] was intended to protect." *Id.; see, e.g., Broussard v. L.H. Bossier, Inc.,* 789 F.2d 1158, 1160 (5th Cir.1986); *Vargus v. Matthew Donut, Inc.,* No. CIV. 92–301–SD, 1994 WL 259802, at *2 (D.N.H. Apr. 4, 1994); *Ridgway's, Inc. v. Payne,* 853 S.W.2d 659, 663 (Tex.App.—Houston [14th Dist.] 1993, no writ).

Additionally, the plaintiff must have timely filed a charge of discrimination with the EEOC or TCHR. *Griffin v. City of Dallas,* 26 F.3d 610, 612–13 (5th Cir.1994); *Schroeder,* 813 S.W.2d at 486. Title VII provides that:

> if the Commission dismisses a charge or if, within 180 days after a charge is filed, the Commission has not filed a civil action, "the Commission . . . shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge."

*Espinoza v. Missouri Pac. R.R. Co.,* 754 F.2d 1247, 1248 (5th Cir.1985) (quoting 42 U.S.C. § 2000e–5(f)(1)). Thus, a civil action must be filed in district court within ninety days of the receipt of the right-to-sue letter from the EEOC. *Berry v. CIGNA/RSI–CIGNA,* 975 F.2d 1188, 1191 (5th Cir.1992); *see also Henry v. Gulf Coast Mosquito Control Comm'n,* 645 F.Supp. 1447, 1452 (S.D.Miss.1986). The filing requirements of

Title VII, however, are not jurisdictional prerequisites to bringing suit in federal court, but are subject to the doctrines of waiver, estoppel, and equitable tolling. *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982); *see also Baldwin County Welcome Ctr. v. Brown,* 466 U.S. 147, 152 n. 6, 104 S.Ct. 1723, 1726 n. 6, 80 L.Ed.2d 196 (1984); *Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 349 n. 3, 103 S.Ct. 2392, 2395 n. 3, 76 L.Ed.2d 628 (1983); *Nilsen v. City of Moss Point,* 701 F.2d 556, 562 (5th Cir.1983) (en banc).

■■■■■■ Although the ninety-day filing requirement is not a prerequisite to subject matter jurisdiction, it is a statutory precondition to maintaining a cause of action in federal court in the absence of extenuating circumstances. *Smith v. Flagship Int'l,* 609 F.Supp. 58, 61 (N.D.Tex.1985) (citing *Sessions v. Rusk State Hosp.,* 648 F.2d 1066, 1070 (5th Cir. [Unit A] 1981)). Like all Title VII filing requirements, the ninety-day filing requirement is treated as a statute of limitations for all purposes. *See Espinoza,* 754 F.2d at 1248 n. 1; *Nilsen,* 701 F.2d at 562. Thus, dismissal of a Title VII claim is proper where the plaintiff fails to prove that the complaint was filed with the court on a timely basis. *Smith,* 609 F.Supp. at 61. In federal court, dismissals grounded on the statute of limitations are final adjudications on the merits. *Steve D. Thompson Trucking, Inc. v. Dorsey Trailers, Inc.,* 880 F.2d 818, 819–20 (5th Cir.1989); *Nilsen,* 701 F.2d at 562.

■■■■■■ Here, Vera has not shown that she filed a charge of discrimination with the EEOC or the TCHR, that she received a right to sue letter, or that she timely filed a complaint in district court. Moreover, even if Vera could meet all of the other requirements, she is not a current or former employee or applicant for employment of UPS and has no standing to sue UPS under Title VII or the TCHRA. The spouse of an employee simply is not a covered individual under Title VII. *See, e.g., Broussard,* 789 F.2d at 1160; *Vargus,* 1994 WL 259802, at *2; *Feng,* 636 F.Supp. at 82; *Ridgway's, Inc.,* 853 S.W.2d at 663.

■■■ Accordingly, as to her Title VII and TCHRA causes of action, Vera has failed to state a claim upon which relief can be granted.

### 3. *State Law Claims*

#### a. *Intentional Infliction of Emotional Distress*

■■■■ In the case at bar, Vera has failed to allege a viable cause of action for intentional infliction of emotional distress. *See MacArthur,* 45 F.3d at 898; *McKethan,* 996 F.2d at 742; *Ugalde,* 990 F.2d at 243; *Ramirez,* 970 F.2d at 1375; *Johnson,* 965 F.2d at 33; *Dean,* 885 F.2d at 306; *Randall's Food Mkts., Inc.,* 891 S.W.2d at 644 (citing *Twyman,* 855 S.W.2d at 621–22); *Wornick Co.,* 856 S.W.2d at 734. There is no assertion that the defendants took any action against her, much less engaged in extreme and outrageous conduct toward her. Similarly, there is no assertion that the defendants caused her to suffer severe emotional distress. *See, e.g., Washington,* 887 S.W.2d at 216–17. Hence, Vera's intentional infliction of emotional distress claim must be rejected.

#### b. *Defamation*

■■■■ Because Vera has failed to allege that the defendants made any statements about her, much less any slanderous or libelous statements, Vera's defamation claim must be dismissed, as well. *See Halbert,* 33 F.3d at 530; *Randall's Food Mkts., Inc.,* 891 S.W.2d at 646; *Hill,* 877 S.W.2d at 778.

#### c. *Invasion of Privacy*

■■■■ Finally, Vera has not alleged that the defendants had any contact with her or that she was involved in any of the events that occurred at UPS. Vera has not asserted that the defendants engaged in any conduct that invaded her privacy, either by intruding on her seclusion or by revealing embarrassing private facts about her. *See Cain,* 878 S.W.2d at 578 n. 2; *Industrial Found. of the South,* 540 S.W.2d at 682; *Billings,* 489 S.W.2d at 860; *Farrington,* 865 S.W.2d at 253. Accordingly, Vera's claim for invasion of privacy cannot stand.

### 4. Local Rules.

The Local Rules of the United States District Court for the Southern District of Texas regulate civil pretrial motion practice in this court. Specifically, Local Rule 6(E) provides that a failure to respond to a motion will be taken as a representation of no opposition. In this case, the defendants filed their motion to dismiss on October 30, 1995. As of today, nearly two months later, the plaintiffs have not responded to the defendants' motion. Therefore, under Local Rule 6(E), the defendants' motion to dismiss is deemed to be unopposed. Unopposed motions are routinely granted, and this court can discern no reason for failing to grant the instant motion.

### III. Conclusion

There exist no genuine issues of material fact with respect to the Pattons' claims of racial discrimination under Title VII and the TCHRA, retaliation, constructive discharge; intentional infliction of emotional distress, defamation, invasion of privacy, wrongful discharge, or breach of the duty of good faith and fair dealing, and the defendants are entitled to judgment as a matter of law. In addition, Vera fails to state a claim upon which relief can be granted.

Accordingly, the defendants' motions for summary judgment and to dismiss for failure to state a claim are GRANTED.

IT IS SO ORDERED.